# Illinois Official Reports

## Appellate Court

---

### *People v. Williams*, 2020 IL App (1st) 162512

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VASHAUN WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-16-2512 |
| Filed<br>Rehearing denied | February 20, 2020<br>April 6, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-19918; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Rebecca I. Levy, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Janet C. Mahone, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1     After a jury trial, defendant Vashaun Williams was convicted of two counts of first degree murder for the stabbing deaths of his 60-year-old uncle, Charles Williams Jr. (Junior), and his 83-year old grandfather, Charles Williams Sr. (Senior), on September 2, 2007. For the two murders, defendant received a mandatory sentence of natural life in prison. At trial, defendant, who was 26 years old at the time of the offense, did not contest that he stabbed his uncle and grandfather; rather, he argued that he acted in self-defense.

¶ 2     On appeal, defendant argues (1) that the trial court erred by not allowing his sister, Nicole Robertson, to testify about an alleged criminal sexual act and battery by Senior against her 20 years earlier and to the impact that this 1987 incident had on his family, which would have corroborated defendant's testimony and the defense theory of the case; (2) that defendant was denied effective assistance of counsel when counsel failed to object to the State's requested use of a void prior conviction for aggravated unlawful use of a weapon (AUUW) to impeach defendant's credibility; (3) that the trial court erred when it instructed the jury concerning second degree murder based on only self-defense but refused to instruct the jury on second degree murder based on provocation and mutual combat; and (4) that the cumulative effect of these errors deprived defendant of a fair trial.

¶ 3     For the following reasons, we affirm.

BACKGROUND

¶ 5     It is undisputed that on September 2, 2007, defendant, Senior, and Junior lived together in the same house, that the three of them were at home without anyone else present when a physical altercation began, that Senior and Junior died of multiple stab wounds, and that defendant stabbed them. The only surviving eyewitness was defendant, who testified at trial that he acted in self-defense after Junior came at him with a knife and Senior joined the altercation.

¶ 6     Prior to trial, defendant moved to introduce, in the defense's case-in-chief, evidence of two incidents of violence by each of the two victims. One incident was a 2004 domestic battery charge against Junior, involving an attack by Junior against his then-girlfriend Verma Wyatt, which defendant sought to introduce through Wyatt's testimony.

¶ 7     The other incident was the alleged criminal sexual abuse and domestic battery in 1987 by Senior of defendant's sister, Nicole Robertson. Although the arrest did not result in a conviction, defendant sought to introduce Robertson's testimony, as well as the testimony of other family members.

¶ 8     Defendant sought to introduce the 1987 incident under two different theories. First, he argued that it was evidence of Senior's violent nature. Second, he argued that the 1987 incident led to the breakup of his parents' marriage and to his mother and sisters moving out of the home that defendant continued to share with his father, and that this incident was "a seething sore in this family." Defendant claimed that Junior was offended by defendant's talking about the incident, that this was the motive for Junior's attack on defendant, and that the 1987 incident was, thus, directly connected to the physical altercation ending in Senior's and Junior's deaths.

¶ 9    During the hearing on defendant's pretrial motion, defense counsel stated that defendant would testify at trial about the 1987 sexual assault, about the effect that it had on defendant's family, and about the ensuing 20 years of turmoil that led to the deaths at issue. Counsel argued that Robertson and the other family members listed by defendant would corroborate defendant's assertion that the 1987 incident, whether it was true or not, created extreme hostility and tension in their family.

¶ 10    The trial court found that the 2004 incident by Junior was admissible but "that the incident involving Ms. Robertson is too remote in time to offer the testimony of Ms. Robertson to suggest that Senior had a propensity of violence." After stating categorically that the 1987 incident was "too remote in time to be relevant and probative on any of the issues in this case," the trial court then immediately modified its finding and ruled instead that defendant could testify about the incident, "[b]ut [it was] not going to allow Robertson to come in and testify to that" incident. The trial court further observed: "I'm certain it will be something that comes up again. But for now that's the way I see this headed, okay."

¶ 11    The defense did not ask, and the trial court did not rule on, whether other family members could testify concerning the hostility and tension that this incident caused. Defendant's other proposed witnesses had included his father, mother, and another sister.

¶ 12    Also, prior to trial, defendant filed a motion *in limine* to bar the State from using evidence of his prior convictions to impeach his credibility. Defendant had six prior felony convictions. He had been convicted of (1) AUUW, on December 8, 2004, receiving a sentence of 3 years; (2) possession of a controlled substance, on May 13, 2004, receiving a sentence of 18 months; (3) manufacture or delivery of cocaine near a school, on October 18, 2001, receiving a sentence of 4 years; (4) possession of a controlled substance, on January 24, 2001, receiving a sentence of 2 years; (5) possession of a controlled substance, on February 23, 2000, receiving a sentence of 8 months of probation; and (6) aggravated battery of a peace officer, on February 17, 1999, receiving a sentence of 2 years.

¶ 13    On March 28, 2016, the prosecutor stated that he was seeking to use only one of the six prior convictions, which was the most recent one or the AUUW conviction. The prosecutor stated that defendant had been released from confinement on the AUUW offense on August 7, 2006, which was less than 10 years ago.[1] When the trial court asked if there were "any other convictions within 10 years," the prosecutor responded no. The trial court then asked defense counsel "[w]hat's your position?" and defense counsel responded that he had no objection. The trial court ruled: "Okay. You can use it then."

¶ 14    At trial, the State called the following family members in its case-in-chief: (1) Alicia Brown, daughter of Stephanie Thomas and granddaughter of Senior; (2) Phyllis Price, Brown's then partner; (3) Cheryl Ann Williams, sister of both Junior and Stephanie Thomas; (4) Barry Thomas Jr., stepson of Stephanie Thomas; (5) Stephanie Thomas, Junior's sister; and (6) Barry Thomas Sr., Stephanie's husband. The State also called police officers and a medical examiner.

---

[1]Rule 609 of the Illinois Rules of Evidence permits evidence of a prior conviction to be used to attack the credibility of a witness, but "[e]vidence of a conviction under this rule is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." Ill. R. Evid. 609(a), (b) (eff. Jan. 1, 2011).

¶ 15 The family members testified that, on September 2, 2007, the day of the murder, the family had gathered earlier in the day at Senior's home for a party to celebrate the fact that he had a scan showing that he was cancer-free. It was also the Sunday of the Labor Day weekend.

¶ 16 Alicia Brown, age 48, testified that Senior had been diagnosed with colon cancer and had begun treatment but his latest scan, as of September 2007, did not show any evidence of cancer. The family decided to hold a celebratory party at Senior's new home on South Perry Street in Chicago. Previously, Senior had lived on Arthington Street, which Brown regarded as "the family home" which she "knew as a child." Brown purchased the family home so that Senior would have the money to move and buy a new home that was closer to the rest of the family. When Senior moved to the new home, defendant and Junior moved with him. Junior, who had recently been awarded his veteran's benefits and medals from serving in Vietnam, helped take care of Senior by doing the grocery shopping, making meals, and aiding in other day-to-day activities. Brown's uncle Prentice, who was defendant's father, also helped out.

¶ 17 Brown testified that, on September 2, 2007, she and her then-partner Phyllis Price arrived at 10:30 a.m. to help set-up for the party. Brown testified that the party was "a great day" and she and Price did not leave until the early evening. At 9:30 p.m., when Brown and Price were at home, Brown received a call from her mother, Stephanie Thomas. In response, Brown and Price immediately drove to Senior's house and called 911. When they arrived, her mother and stepfather Barry Thomas Sr were already present, as well as the police.

¶ 18 Brown testified that, shortly before she had left the party, her grandfather said he was going to lie down for a bit in his bedroom. Senior was not eating full meals because he had a colostomy bag, and he had spent most of the day outside in the sun, so he was tired. Before leaving, Brown looked in his bedroom, observed him sleeping, and did not wake him. Before she left, Junior indicated that he was going to lie down on the living room couch in front of the fan and cool off. During the party, Brown observed defendant talking to Price at one point in the kitchen, but Brown did not observe him outside on the back porch or in the backyard or "engaging" with everyone. For most of the barbecue, Brown and other family members were outside, although people had been eating sometimes in the dining room.

¶ 19 Brown was shown five knives and identified two of them: one was "used to cut ribs and chicken," while the other was "used to like hack at[,] to make rib tips." Brown testified that Junior had told her that he was taking seizure medication. On cross-examination, she testified that, as a registered nurse, she knew that some seizure medications can have an adverse effect if mixed with alcohol.

¶ 20 Phyllis Price, Brown's former partner, testified largely consistently with Brown's testimony. Brown did not observe defendant on the back porch during the party, but she encountered him when she entered the house to use the bathroom. Price recalled that defendant had a child, and she asked him if his child was coming to the party. Defendant responded in an angry manner: "don't ask me about no baby." Defendant acted "very different[ly]" from when she had last spoken with him in July. Previously, she had felt that he had "kind of open[ed] up" when talking with her. Price did not observe him mingling with the family during the party.

¶ 21 On cross-examination, Price testified that she did not encounter defendant in the kitchen but rather outside of his room where he was "sullen."

¶ 22 Cheryl Ann Williams testified that Senior was her father and her siblings included Stephanie Thomas; Prentice Williams, who was defendant's father; and Junior, one of the victims. Since she shares the same last name as defendant and both victims, we refer to her as

Cheryl. Prior to September 2007, Cheryl had observed that Senior's hands had become gnarled and he had difficulty picking up things. As a result, he did not use utensils when eating but instead used his hands. Senior also had a colostomy bag as a result of his surgery for colon cancer.

¶ 23    Cheryl testified that she did not arrive at the party on September 2, 2007, until the early evening. Everyone gathered on the back porch, and the food was on the dining room table. Cheryl did not observe defendant on the back porch and testified that he was in his room. When she first arrived, she had brought with her a big pot of vegetables that she took into the kitchen to set on the stove, and she observed defendant in the kitchen pouring himself a cup of coffee. When Cheryl asked defendant how he was doing, "he just walked right past [her] like [she] was invisible" and walked back to his room. Other than that incident, she did not observe any anger or animosity among the other people at the party. Later that evening, she left the party and went home. At 9 p.m., she was at home talking to her sister Stephanie Thomas on the phone, when she heard someone on Stephanie's end say " 'Auntie, I need your help.' " At first, she did not recognize the voice as defendant's voice, but when he kept talking, she recognized his voice. Defendant stated: " 'They came at me, and I had to defend myself.' " Stephanie then asked him " 'who came at you,' " and he replied " 'Granddad and Uncle Charles.' "

¶ 24    Cheryl testified that, although she was screaming for Stephanie not to hang up the phone, Stephanie said that she would call Cheryl back. Cheryl called her son Andrew, got dressed, and returned to Senior's house. When she arrived, she observed police vehicles, an ambulance, Senior's dog, and family members outside.

¶ 25    On cross-examination, Cheryl testified that, when she first arrived at the party, she observed Junior drinking a beer but she did not know how many beers Junior had consumed. When Cheryl left the party at 7:40 p.m., Junior did not appear intoxicated. Senior had enough control over his hands to pour a glass of wine for her mother from a wine bottle, although he spilled a little. Senior could not hold a utensil because it was too thin, but he could hold a wine bottle. Senior was drinking wine at the party, and he was able to handle a wine glass. At the party, Senior was walking bent over, but he was not using a cane.

¶ 26    Officer Israel Gomez of the Chicago Police Department testified that, on September 2, 2007, at 9:20 p.m., he was working with his partner, Officer John Gregoire, when he stopped defendant and Barry Thomas Jr., whom he already knew. The officers were in plain clothes and driving an unmarked Crown Victoria on Princeton Street. Gomez asked defendant for his name, which defendant provided, and Gomez then performed a protective pat-down search. Observing blood on defendant's clothing, Gomez asked defendant if he needed medical attention. After defendant responded that he did not need medical attention, Gomez asked defendant how he had cut himself. Defendant answered that he had cut himself with glass earlier. Gomez then informed them that they were free to go.

¶ 27    Barry Thomas Jr. (Thomas Jr.), age 38, testified that he had lived on South Princeton Street since he was 2 years old, with his parents Stephanie and Barry Thomas Sr. (Thomas Sr.). Thomas Jr. did not attend the party on September 2, 2007, because it was hot. In the evening, he went to a nearby park, played basketball, and was heading home when a police officer called to him from an unmarked vehicle. The officer, who knew him, asked him who a certain person was, and that was when he observed defendant standing by a tree, a couple of houses away from Thomas Jr.'s home. Defendant said: " 'Barry, do you remember me.' " It had been at least 10 years since Thomas Jr. had last observed defendant. The officer told defendant to place

- 5 -

his hands on the vehicle so he could be searched, which occurred. The officer asked defendant why there was blood on him, and defendant responded that he had cut himself on some glass. Thomas Jr. did not know the exact time, but he reasoned that it "was just about to get dark" and "it gets dark around 9 p.m." When the police left, defendant asked if "his auntie" was home and if he could talk to her. Thomas Jr. understood defendant to be referring to Stephanie Thomas. Thomas Jr. headed home, let defendant inside, and told Stephanie Thomas that defendant was there. When Thomas Jr. called out her name, "she must have come to the door" of her bedroom, "because she said [defendant] scared her."

¶ 28    On cross-examination, Thomas Jr. acknowledged that he testified before the grand jury that Stephanie Thomas said that defendant had scared her and that he then heard defendant say " 'Somebody is trying to test me.' "

¶ 29    Stephanie Thomas[2] testified that her daughter, Alicia Brown, had purchased Senior's old home so that he could move closer to Stephanie. Defendant had spent a lot of time at her parents' old home on Arthington Street when he was growing up. Her parents "doted" on him and would do anything for him, and he often slept in their bed when he was little. She never witnessed any arguments between defendant and Senior or Junior. In September 2007, Senior was moving slower and was weaker. He had arthritis in his hands, which would shake and appeared gnarly.

¶ 30    Stephanie arrived for the party at 2 p.m. on September 2, 2007. Stephanie did not observe defendant on the back porch, but she did encounter him in the kitchen pouring a cup of coffee. Although Stephanie spoke to him, he did not say anything. "He was stirring and stirring and stirring his coffee like he was in deep concentration." There was no animosity or anger among anyone at the party.

¶ 31    Stephanie testified that she and her family left the party sometime between 6:30 and 8 p.m. Once home, Stephanie called her sister Cheryl. They talked about how "strange" defendant was acting, that he was "not participating," and that they thought that was "odd." While Stephanie was talking to Cheryl, she heard Thomas Jr. say that defendant was there. Defendant then entered her room and perched on the bed, and she asked him " 'what is going on?' " While they were seated several feet apart, Stephanie did not observe any injuries on his face or body, and he did not appear to be in physical distress.

¶ 32    Stephanie testified that defendant stated: " 'Auntie, I need your help.' " Then he stated: " 'They came at me.' " When she asked who had come at him, he replied: " 'Granddad and Charles, Charles came at me with a knife.' " When she asked about Senior, defendant replied: " 'Him, too.' " When defendant was speaking, he was "cold," exhibiting no signs of emotion. Stephanie called out for her husband, who entered the room and asked " 'How bad is it[?]' " To which, defendant replied: " 'It's bad.' " While Stephanie and her husband were dressing, defendant left. As Stephanie and her husband were heading to Senior's house, Stephanie called 911, and the State then played the 911 call for the jury. When they arrived at Senior's home, Stephanie's husband entered first and then told her she could not enter. As they were heading outside, the police arrived and told them to leave the house.

_____

[2]Stephanie Thomas was married to Barry Thomas Sr., and when they married, she had three children, including Alicia Brown, and he had four children, including Barry Thomas Jr. Since there are three witnesses with a last name of Thomas, we refer to her as Stephanie. Her siblings included Cheryl; Prentice Williams, who was defendant's father; and Junior, one of the victims.

¶ 33    On cross-examination, Stephanie testified that, while Junior had "maybe" suffered from mood swings in the past, she had not observed him suffering from mood swings or alcoholism in September 2007. At the party, she observed him with one beer, and he did not appear intoxicated when she left. Defendant stayed with Stephanie's parents when he was little because his parents' marriage had fallen apart. Stephanie was not aware that there was an incident in 1987 that led to the breakup of defendant's parents' marriage. Stephanie was not aware that Senior had been arrested in 1987 for aggravated criminal sexual abuse of his granddaughter, Nicole Robertson. Stephanie did not know what happened to defendant's sisters after his parents' marriage ended. After the breakup, Stephanie "saw the girls maybe once."

¶ 34    Barry Thomas Sr. testified that he was married to Stephanie, and his testimony largely corroborated her testimony about the party and the events of the day. After the party and after defendant had left their home on September 2, 2007, Thomas Sr. drove their vehicle back to Senior's house while Stephanie called 911. They were the first people on the scene. Thomas Sr. walked to the front door, while his wife was still on the phone. After entering the front door, he walked up three or four steps and observed Junior lying dead in a pool of blood in the living room. Then he walked to Senior's bedroom, where he observed Senior lying on the floor in a pool of blood. Stephanie had started to enter the front door, so Thomas Sr. returned to the front door in order to stop her from entering. After speaking with the police who had arrived, Stephanie and Thomas Sr. went home, where Thomas Sr. woke up his son and told him what happened, and they all went to the police station.

¶ 35    Officer John Nicezyporuk of the Chicago Police Department testified that, on September 3, 2007, at 3:25 a.m., he was on patrol with his partner Officer Chris McGuire in a marked police vehicle, when they received a battery report over the police radio from a hospital in Oak Park. The officer explained that a battery report occurs when the hospital staff observe an injury that is consistent with a battery. The report named defendant, and the operator recognized the name from a prior "all call," which occurs when someone is wanted for an offense. At the hospital, Officer Nicezyporuk asked one of the triage nurses if there was someone with defendant's name waiting to be treated, so she called defendant's name, and he stood up. Defendant was using his left hand to hold his right hand up, close to his chest, and his right hand had a bandage on it. After defendant stood up, they placed him under arrest, which involved handcuffing him. Other than the fact that he was favoring his right hand, the officer did not notice any other signs of distress or injuries. Officer Nicezyporuk was with defendant while defendant was examined and treated, and defendant did not receive any stitches. At 5 a.m., defendant was discharged from the hospital, with several Band-aids or sterile strips on the palm of his hand and no other bandages. On cross-examination, Officer Nicezyporuk testified that defendant had lacerations on both hands. Defendant was cooperative and did not resist arrest.

¶ 36    Brian Forberg of the Chicago Police Department testified that he was presently a sergeant but that in 2007 he was a detective and that, on September 2, 2007, at 10 p.m., he was assigned, with his partner Detective Eberle, to investigate the double homicide at Senior's house. They found Junior lying in the living room, covered in blood, near an overturned coffee table that also had blood on it. Junior was not wearing a shirt or shoes, and there was blood caked around his hands, his arms, and his upper body. His glasses were on the floor. There was blood alongside a nearby easy chair, as well as on the chair itself and on a nearby couch. In the corner

was a box fan.[3] There was broken glass that had been part of the coffee table. Junior was "cradled around the wastebasket," and there was "blood cast on the walls and curtains." Blood was flowing down his back and all over the carpet. Junior had no objects in his hands. Forberg "determined [it] was evidence of a pretty intense struggle."

¶ 37     Forberg testified that there was blood on the doorknob and smeared on the door to Senior's bedroom, where Senior's body was found lying on his back, on the floor. His head was partially under an end table. He was wearing socks, blue jeans, and a white T-shirt, which was soaked in blood. His right hand was clasped over his left hand, and his hands were folded over his chest. There was a cane hanging from the handle of the closet door. There was blood up and down his jeans and along his forearms and on the carpet. Senior had a large, gaping throat wound, with a large deposit of blood to the right of his head, which flowed underneath a cabinet. He had no objects in his hands. There was blood on his hands, and his hands had cuts, which the detectives believed to be defensive wounds.

¶ 38     Forberg testified that he did not find any knives in either Senior's bedroom where Senior's body was located or in the living room where Junior's body was found. Forberg did find bloody footprints on the carpet leading from Senior's bedroom to defendant's bedroom. The door to defendant's bedroom had blood smears on it. Inside defendant's bedroom, they found a pair of jeans with "blood all over" them, as well as blood on the floor. There was a phone in defendant's room, but the police did not receive any 911 calls from defendant.

¶ 39     Forberg testified that, in the bathroom, they found blood around the sink, bloody tissue in the toilet, and, to the right of the toilet, a knotted plastic bag with blood on the outside and a knife blade sticking out of it. The bag contained five knives. Two of the knives had plastic handles and were bent. The remaining three knives were longer steak knives with wooden handles and blades with blood deposits. One of the three wooden-handled knives was also bent.

¶ 40     Forberg testified that, at 4 a.m. on September 3, 2007, he learned that defendant had been detained at a hospital and Forberg arrived as defendant was being treated by a doctor. On the day of arrest, defendant was approximately 170 pounds and six feet tall, with no signs of injury to his face, neck, arms, or chest. The Band-aids on his fingers were "bandages that you put on your kid if he skinned his knee." After defendant was taken into custody, they recovered his shirt, jeans, socks, and shoes because there was blood on them. The bottom of the socks were "drenched in blood." The cushion area of his gym shoes was "spongeable" and also "drenched" in blood. Forberg testified that the cushion area was "very wet even at that point." However, Forberg did not observe any injuries to defendant's legs or feet.

¶ 41     On cross-examination, Forberg acknowledged that Thomas Sr. had entered the residence prior to the police and possibly his wife as well. The placement of the knives in one bag meant that blood could potentially have been mixed from one knife to the other. Defendant's sister, Jacquiese Robertson, was with defendant at the hospital.

¶ 42     The parties stipulated that experts in DNA and biochemistry from the Illinois State Police Crime Lab would testify, if called, that a DNA profile obtained from blood in defendant's right shoe matched defendant but not Senior or Junior; that a DNA profile obtained from blood in defendant's left shoe matched Junior but not defendant or Senior; that a mixture of two DNA

---

[3]Forberg's testimony about a box fan corroborates, in part, Brown's testimony that, before she left the party, Junior indicated that he was going to lie down on the living room couch in front of the fan and cool off. *Supra* ¶ 18.

profiles was obtained from the jeans found on the floor of defendant's bedroom and one matched Junior and Senior could not be "excluded from having contributed" to the other one; that the five knives had blood with a mixture of DNA profiles; that at least two of these profiles matched Senior and at least two matched defendant; that DNA profiles obtained from blood on the door frame to Senior's bedroom and from the jeans and shirt that defendant was wearing when he was arrested matched defendant; and that a DNA profile obtained from blood in the hallway between defendant's bedroom and the bathroom matched defendant.

¶ 43    Dr. Michelle Jorden, an assistant medical examiner, testified that she was currently employed at the coroner's office in San Jose, California, but that she had previously worked at the Cook County Medical Examiner's Office in Chicago, where she had conducted the autopsies of both Senior and Junior. The trial court accepted her, without objection, as an expert in forensic pathology and neuropathology. At the time of his death, Junior was 60 years old, 191 pounds and 6 feet, one-half inch tall. Dr. Jorden explained that the difference between a stab wound and an incised wound is that a stab wound is deeper than it is long, while an incised wound is longer than it is deep. Junior's body exhibited multiple incised and stab wounds, including "a large incised wound that encompasse[d] the entire anterior neck." "[T]hat wound course involved the skin, the subcutaneous tissue, the right carotid artery, the left jugular vein and a portion of the left side of the trachea." Dr. Jorden explained that the "trachea is the major windpipe in the throat." Junior's jugular vein was "entirely transacted."

¶ 44    Dr. Jorden testified that there were stab and incised wounds to Junior's right arm; incised wounds to his left arm; and a stab wound to the right base of his neck or upper chest area which was so deep that it entered the right chest cavity and punctured the right lung. The three larger knives in the bag "[c]ould be consistent" with making this deep wound. Dr. Jorden testified that there was "another deep penetration stab wound" that entered the left chest cavity and punctured the left lung. There were incised wounds to his ear and within his mustache. In addition to the "numerous stab and incised wounds," Dr. Jorden also observed multiple blunt trauma injuries, by which she meant "abrasions or bruises" that were not older injuries but were sustained at the time of the incident, and multiple defensive injuries on his hands.

¶ 45    Dr. Jorden testified that Junior's blood tested positive for alcohol or ethanol and the concentration was 177 milligrams per deciliter. Dr. Jorden concluded, to a reasonable degree of medical certainty, that the cause of Junior's death was multiple stab and incised wounds.

¶ 46    Dr. Jorden testified that Senior was 83 years old; 5 feet, 9 inches tall; and 167 pounds. When Dr. Jorden examined him, "[h]is body was completely devoid of blood." Dr. Jorden observed a surgical scar and a colostomy bag with a small amount of soft stool, but she did not observe any signs of cancer in his body. There was an incised wound to the left side of his head, a deep incised wound to the right side of the nose that produced a flap, an "L-shaped stab wound" to the right side of his face involving his neck, "a jagged stab wound along the right jaw line" that extended to the base of the tongue, a stab wound to the right side of the neck, "a larger deep incised wound also involving the right side of the neck," and a deep stab wound to the left side of the neck. Some of the injuries would be consistent with a single stabbing incident where the knife entered the body, came out a small bit, and then continued across from the person's right to left side of the neck.

¶ 47    Dr. Jorden testified that she observed defensive injuries to Senior's hands and evidence of blunt force trauma, which included bleeding around the pancreas and in the fatty tissue surrounding the small and large intestines. Dr. Jorden explained that the trauma injuries she

observed were "sustained from pretty deep penetrating blunt force trauma, such as a kick or a stomp or a punch." In addition, she observed a fractured rib. Dr. Jorden opined, to a reasonable degree of medical certainty, that Senior died from multiple stab and incise wounds. The toxicology report for Senior was negative for alcohol.

¶ 48　　On cross, Dr. Jorden testified that Junior appeared younger than his 60 years, that the cut to his neck was fatal, due to the severing of both the carotid artery and the trachea, and that he died within minutes of that wound. Junior's blood alcohol level, "in common parlance," was 0.17, which is in excess of two times the legal limit of 0.08. For Senior, the stab wound to his neck was also fatal, due to the injury to both the carotid artery and jugular vein, and he also would have died within minutes. While blunt force trauma can be caused by a fall into another object, Senior's blunt force injuries were "internally *** very deep," and whether they could be caused by a fall would depend on what object he fell onto. After Dr. Jorden testified, the State rested.

¶ 49　　The defense called Verma Wyatt, age 67, who testified that in May 2004 she was living with Junior, who was then her boyfriend. Wyatt recalled a time when Junior had just returned from visiting his father and she was sorting things on the bed, and he asked her what she was doing, and she said nothing. Then, "all of a sudden," he grabbed her around the neck and said that he could break her neck. Then he let her go "as quick as" he had grabbed her. Wyatt ran to the phone, and Junior pulled the phone out of the wall. Junior started "coming at" Wyatt, but then he stopped and hit himself in the head and said "oh, my goodness, what am I doing, did I hurt you." Then he ran out of the house. Wyatt and Junior had been "dating basically back and forth all [her] life," but that particular time had started in 2000 or 2001 and ended in 2006 or 2007. During the choking episode, she assumed that he had been drinking, but it was "different from his normal drinking." Wyatt testified that Junior's eyes "weren't right" and she had "never seen him like that before."

¶ 50　　Wyatt testified that, after Junior left, she called her mother and placed the sofa and other furniture in front of the door, in case he returned. The next morning, she went to her mother's house, taking her two cats with her. From her mother's house, she called the police. Wyatt testified that she wanted only a restraining order, but the police arrested Junior and he lost his job. After the choking incident, they reunited but she made him promise that he would not drink. She believed that drinking had had something to do with his violent outburst. From 2001 to 2004, Junior had been drinking on a regular basis.

¶ 51　　On cross-examination, Wyatt testified that, when Junior would drink, he would become verbally abusive, but not physically abusive, except for that one incident. On redirect examination, Wyatt testified that, after 2001, when Junior was drunk and verbally abusive, she told him that he "need[ed] to stop drinking because it would get out of hand." Then he would go to Senior's house for a few days because Wyatt "couldn't handle it." The drinking increased when Junior was at Senior's house, and he would return drunk. After Wyatt's testimony, the defense moved for a direct verdict, which was denied.

¶ 52　　Defendant took the stand in his own defense and testified that he grew up on Arthington Street, where he lived with his grandmother and Senior; his parents; and his two sisters, Nicole and Jacquiese Robertson. At some point, he and his parents and his two sisters moved down the block from his grandparents. Defendant loved his grandfather and was close to him. While Senior treated defendant well, Senior would also discipline defendant with "whoopin[g]s."

¶ 53        Defendant testified that, in the summer of 1987, his grandparents were living on Arthington Street and defendant was living down the block. Defendant's parents were "partying" at that time, so his grandparents were "like our mother and father." His grandfather came over, and they told him they were hungry, so he gave defendant and Jacquiese $20 and told them to buy cereal and milk and told Nicole to stay at home. When defendant and Jacquiese returned, Nicole was on the couch crying and under a sheet, and Senior left. When defendant's parents returned, they spoke to Nicole. Then his parents started fighting, and 911 was called. The police arrested Senior, and they almost arrested defendant's father because he was trying to prevent the police from arresting Senior. After that incident, his parents split up. His mother took his sisters to her grandmother's house, and defendant lived with Senior. In addition, Senior and defendant's grandmother also split up.

¶ 54        Defendant testified that in 2004 he had a criminal conviction for gun possession, and in 2006 he was paroled to Senior's house on Arthington Street, where he was "on house arrest." In 2006, Senior, Junior, and Senior's late girlfriend were also living at the house. When Senior and Junior drank, they would argue and fight. Senior and Junior drank "Christian Brothers, hard liquor, brandy, [and] beer." When Senior became drunk, he would "start cursing people out." Defendant witnessed Senior and Junior physically fight numerous times. Junior turned into "a different person" when he drank. Junior served in the army and told defendant numerous stories about his combat service in Vietnam. Senior also served in the army and saw combat in World War II.

¶ 55        Defendant testified that, in 2006, he was in a relationship with Lakeitha Williamson and they had a daughter in February 2007. Williamson lived with their daughter two blocks away on Arthington Street. Defendant was working at a Best Buy store in Schaumburg and taking classes. In the spring of 2007, Senior sold the home on Arthington Street to defendant's cousin Alicia Brown and purchased another home on South Perry Street. Defendant did not want to move, because Williamson did not want their daughter around Senior and Junior. When defendant spoke to Senior and Junior about it, it led to a lot of arguing. In June 2007, Senior was hospitalized for cancer, but he returned home soon thereafter and was physically and mentally the same.

¶ 56        Defendant testified that, in the week before September 2, 2007, the three of them had a big argument "about the situation" at Senior's house on Perry Street. Defendant was trying to change his house arrest so he could move, and he had packed up half his things. The argument began when they asked him why he was moving. Defendant told Senior that he knew Senior "did it," referring to the sexual abuse of defendant's sister Nicole. That was the first time that defendant had expressed an opinion on the subject. After that, Junior and defendant stopped talking to each other, and Senior and defendant "stopped dealing with each other." Senior and Junior thought he should believe them. During the following week, defendant was out of the house as much as possible.

¶ 57        Defendant testified that on September 2, 2007, Senior and Junior threw a backyard party, to which defendant's sisters, Jacquiese and Nicole Robertson, were not invited. Although defendant stayed mostly in his room, he did speak to his grandmother and his father's wife. After the party, defendant exited his room to obtain the house phone from its base in the living room. As soon as defendant entered the living room, Junior started cursing at defendant, telling him he was not family anymore and asking why he did not participate in the party. After picking up the phone, defendant returned to his room, but his door burst open a few seconds

later, and Junior rushed in with a knife in his hand. Junior had never done that before. Junior did not usually enter defendant's room.

¶ 58    Defendant testified that, when he told Junior to "get out" of his room, Junior swung the knife at defendant and defendant put his hand up and the knife went into defendant's hand. Junior was saying "I'm going to kill you, mother ***" and defendant believed that Junior was trying to kill him. Defendant tried to take the knife from Junior but could not do it, and they fought over the knife in the hallway. Defendant grabbed a knife off a table, and the two of them were swinging at each other with knives and fighting. The two of them "crashed" into the living room and fell on a table. At one point, they were upright, and at another point, they were down and trying to rise back up.

¶ 59    Defendant testified that, after he and Junior had been fighting for 30 to 45 seconds, Senior entered the living room and said "get off my son." Senior tried to pull defendant off Junior and tried to swing at defendant, while defendant tried to push Senior away and hold Junior down so Junior could not swing at him again with the knife. Senior had a knife and swung it at defendant, cutting defendant's right palm. After that, they were wrestling and fighting. Defendant was trying to keep Junior off balance, so Junior would not have a chance to swing the hand with the knife, which Junior kept trying to do. Defendant testified that "all I could do is just swing and just try to slash and get—get—get them up off me." At some point, while Junior and defendant were still wrestling on the floor, Senior walked toward his bedroom, stating "I'm fittin' to shoot this MF." Defendant swung a couple of more times and Junior let go, and defendant ran toward his bedroom. As defendant was heading toward his bedroom, he looked into Senior's room and observed Senior fall on the other side of his bed.

¶ 60    Defendant testified that, after he entered his own bedroom, he stood there, panicked and shocked, and he tried to call on his cell phone but his hands were not "working." He had "a lot of gashes and cuts" on his hands, so he dropped the phone. Defendant changed clothes, removing his bloody pants and putting on other pants. Before leaving the house, he tried to stop the bleeding in the bathroom. When he left Senior's house, he drove to his aunt Stephanie's house. When defendant arrived at his aunt's house, he observed his aunt's stepson, Barry Thomas Jr., standing in front of the house. As defendant was walking toward him, the police pulled up and shone a spotlight on the both of them.

¶ 61    Defendant testified that the police asked Barry Thomas Jr. "where the drugs at" and he replied that he did not have any. Then they asked who defendant was, and he said, "my cousin." The police asked defendant if he had identification, and he replied that he did. When the police placed him on their vehicle, they observed the blood on defendant's hands and asked about it. Defendant replied: "I fell on some glass." After the police let them go, Barry Thomas Jr. opened the front door and let defendant inside, and defendant went to the back of the house, where he found his aunt Stephanie. Defendant told her that she had to help him and that Junior had just stabbed and tried to kill him. When she asked about Senior, defendant explained that Senior tried to help Junior and Senior was also stabbed. Stephanie then called for her husband, who started asking what happened. When defendant started talking about stabbings, Barry Thomas Sr. went into his room toward a "lockbox." Defendant left the house and drove away because defendant was afraid that Barry Thomas Sr. was going for a gun.

¶ 62    Defendant testified that he drove to the home of his sister, Jacquiese Robertson, who lived on the west side. Defendant told her what happened and asked her to take him to the hospital and to a police station, so he could turn himself in. She drove to the hospital because his hands

had started hurting badly and were bleeding. After he had waited for 40 minutes at the hospital, it was 3 a.m., and police arrived. The police told the triage nurse to call his name, which she did, and he stood up and was placed under arrest. The police wanted to remove him immediately from the hospital, but the triage nurse stopped them, saying that he needed treatment first. A doctor then placed adhesive tape on his hands. Defendant had eight or nine stab wounds on his hands, as well as cuts, and a cut around his wrist. Later, when he was in Cook County jail, his hands became infected and swelled up "like boxing gloves," and he was transferred to the medical part of the jail, where he received an antibiotic drip. Defendant was then transferred to John H. Stroger Jr. Hospital, where he had four separate surgeries on his hands over the course of five days.

¶ 63    On cross-examination, defendant testified that he was convicted of aggravated unlawful use of a weapon in 2004, that he did not recall when his parents divorced, and that he did not learn of the party until the same day. Defendant denied talking at the party to Stephanie or Cheryl or Alicia Brown but did acknowledge speaking with Phyllis Price, who asked him where his daughter was. Defendant was not bigger than Junior but was taller than Senior. Defendant did not know how many times he swung his knife at Senior and Junior; he was swinging wildly and not aiming. In addition to the cuts on his hands, defendant had a cut on the side of his left arm, and his right eye was swollen. Defendant denied leaving a bag of knives in the bathroom and testified that he left his knife in the living room. The last time he observed the knife that Senior had, Senior had it in the living room, and the last time he observed the knife that Junior had, it was in Junior's hand. At the hospital on September 3, 2007, the police did not allow the doctor to give him stitches and did not remove his handcuffs while he was being treated. When defendant left Stephanie's house, he knew that Stephanie was on the phone with the police and, thus, the police would check on Senior and Junior.

¶ 64    On cross-examination, the prosecutor asked: "Nothing stopped you in August of 2007 from moving out of the house on Perry and moving in with your girlfriend, right?" In response, defendant explained that his parole terms stopped him: "I didn't get approved by the house arrest [to] go[ ] there. I tried to change it, [but] they wouldn't—wouldn't approve it. So that's why I actually went [to] Perry [Street]. I was the last one to move out of [the] Arthington address, because I wasn't trying to go ***. I was trying to wait and see if I could go to another address. So basically, I was forced to move *** into [the] Perry [Street house]."

¶ 65    After defendant testified, the defense rested. During closing arguments, defense counsel argued that defendant had a reasonable belief in the need for self-defense or, in the alternative, an unreasonable belief. Counsel argued: "If he acted, or reacted, reasonably, that's not first degree murder. That's self-defense. If he acted unreasonably, that's second-degree murder." After listening to the parties' arguments and the jury instructions, the jury retired to deliberate and found defendant guilty of both counts of first degree murder. The trial court denied defendant's posttrial motion for a new trial and, after considering factors in mitigation and aggravation, sentenced defendant to a mandatory term of natural life.

¶ 66    Defendant filed a *pro se* posttrial motion alleging ineffective assistance of counsel, which the trial court denied, finding "The trial that was conducted in this case by the lawyers that represented you was—was based on a strategy that I believe was very, very compelling. I believe they did an excellent job in representing you. I believe that unfortunately while it is compelling on paper it did not convince the jury, and that's why they returned the verdicts they

returned." Defendant filed a notice of appeal, and this timely appeal followed.

¶ 67                                                ANALYSIS
¶ 68                              I. Nicole Robertson's Proposed Testimony
¶ 69        Defendant claims that he was denied the right to present a meaningful defense when the trial court barred the testimony of his sister, Nicole Robertson. Defendant claims that she would have substantiated his claim that Senior's sexual abuse of her left a legacy of tension in their family. The defense theory of the case was that Junior lunged at defendant with a knife, after defendant had disrespected the family by stating that he believed Robertson's claim of abuse.

¶ 70        Prior to trial, defendant had also argued that Robertson's testimony should have been admissible to show Senior's violent nature. See *People v. Lynch*, 104 Ill. 2d 194, 200 (1984) ("when the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor"). However, in his brief to this court, defendant expressly abandoned this argument on appeal.

¶ 71        A criminal defendant is constitutionally guaranteed a meaningful opportunity to present a complete defense. *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006); U.S. Const., amends. VI, XIV; and Ill. Const. 1970, art. I, § 8). Defendant argues that, although a judge's evidentiary ruling is ordinarily reviewed for an abuse of discretion, the question of whether a defendant's constitutional right to present a complete defense was violated is a purely legal question that is reviewed *de novo*.

¶ 72        *De novo* consideration means that a "reviewing court performs the same analysis that the trial court would perform." *People v. McDonald*, 2016 IL 118882, ¶ 32; *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. By contrast, an abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Burgess*, 2015 IL App (1st) 130657, ¶ 134.

¶ 73        In support of his argument for a *de novo* standard, defendant cites *People v. Hale*, 2013 IL 113140, ¶ 15; and in support of its argument against a *de novo* standard, the State cites *Burgess*, 2015 IL App (1st) 130657, ¶ 133. In *Hale*, our supreme court observed: "In general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *Hale*, 2013 IL 113140, ¶ 15. However, in *Burgess*, this court found that, "when a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *Burgess*, 2015 IL App (1st) 130657, ¶ 133. The abuse-of-discretion standard also applies to motions *in limine* such as the one at bar. *Burgess*, 2015 IL App (1st) 130657, ¶ 134.

¶ 74        We find that the abuse-of-discretion standard applies for the following reasons. In the case at bar, defendant was allowed to, and did in fact present, his defense and his theory of the case. Although the trial court specifically barred Nicole Robertson's testimony, it also specifically permitted defendant to offer his own testimony on this subject. The trial court also indicated that it was willing to revisit the issue, stating that it was "certain" that the issue would "be something that comes up again," but the defense did not revisit the issue after defendant's testimony. In addition, the defense had listed several other witnesses, in addition to Robertson,

who it could call on this subject, and defendant did not call them.[4] When the trial court made its ruling about what evidence it would permit and what evidence it would bar on this topic, defense counsel did not seek to clarify the court's ruling with respect to defendant's other proposed witnesses. Thus, we review this issue as primarily an evidentiary ruling and apply an abuse-of-discretion standard of review. Defendant argues that, under either standard, the trial court erred.

¶ 75    For the same reasons that we find an abuse-of-discretion standard applies, we also cannot find an abuse of discretion occurred. Rule 403 of the Illinois Rule of Evidence provides that evidence, "[a]lthough relevant," may still be excluded if its probative value is substantially outweighed by the danger of confusion of the issues, undue delay, or waste of time. Ill. R. Evid. 403 (eff. Jan. 1, 2011). It was reasonable to avoid a minitrial on alleged sex abuse that occurred 20 years prior to the offense, particularly where the charges were dismissed. As framed by the defense, the issue was not whether Robertson was, in fact, abused by Senior in 1987 but rather how the incident still affected the family in 2007. In the interest of avoiding a minitrial, it was reasonable to bar the alleged victim from testifying, while permitting defendant to testify about how that 20-year-old incident affected the family and the events in question.[5] The trial court conducted a reasonable balancing of interests in making its ruling. Whether we would have ruled the same way when faced with the same question is not the issue before us now; we cannot say that no reasonable person would take the same view that the trial court did. *McDonald*, 2016 IL 118882, ¶ 32 (under an abuse-of-discretion standard of review, "[t]he question is not whether the reviewing court would have made the same decision if it were acting as the lower tribunal"); see also *Snelson v. Kamm*, 204 Ill. 2d 1, 33 (2003) (with respect to evidentiary rulings, "a reviewing court will not reverse the trial court unless that discretion was clearly abused").

¶ 76    On appeal, defendant argues that Robertson's testimony was particularly needed after Stephanie Thomas, another sister, was asked by defense counsel on cross-examination about the alleged 1987 abuse and she denied that it happened and denied that there was "any animosity or anger" in the family on the day of the murder, prior to, of course, the murder itself. However, this information was brought out by the defense, not the State, and the defense did not seek to renew its motion regarding other witnesses after she testified, nor did the defense seek to revisit the issue. See *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 52 (a party cannot complain of an error that it procured). Thus, we do not find this argument persuasive.

¶ 77    In sum, we cannot find an abuse of discretion by the trial court with respect to this issue and are not persuaded by this claim.

---

[4]In his brief to this court, defendant maintains that "six witnesses were willing to testify that [the 1987 abuse] happened and about the incident's [effect] on the family" and observes that at least two of the witnesses, Jacquiese Robertson and Prentice Williams (defendant's sister and father), were under subpoena by the State and had appeared in court. After Forberg's direct examination but prior to his cross-examination, the trial court observed that Prentice Williams was present in the courtroom, and defense counsel stated that the defense did not intend to call him as a witness.

[5]The trial court ruled: "If the defendant is going to take the witness stand and testify that he got into an argument with his father and grandfather concerning incidents that happened in the family 20 years ago, then that's his explanation of why he, why what happened, happened, okay."

- 15 -

¶ 78                                    II. Defendant's Void AUUW Conviction

¶ 79        Defendant claims that he was denied effective assistance of counsel when his trial counsel failed to object to the State's proposed use of his void prior AUUW conviction to impeach his credibility.

¶ 80                                         A. The *Strickland* Test

¶ 81        Every Illinois defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *People v. Domagala*, 2013 IL 113688, ¶ 36.

¶ 82        The Illinois Supreme Court has found that, to determine whether a defendant was denied his or her right to effective assistance of counsel, an appellate court must apply the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Domagala*, 2013 IL 113688, ¶ 36 (citing *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting *Strickland* for Illinois)); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (also citing *Albanese*). Under *Strickland*, a defendant must prove both (1) that his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and (2) that, absent these errors, there was a reasonable probability that his trial would have resulted in a different outcome. *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687, 694); *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (also citing *Strickland*).

¶ 83        To prevail, a defendant must satisfy *both* prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). That means that, if an ineffective-assistance claim can be disposed of because the defendant cannot satisfy one prong, we need not determine the remaining prong. *People v. Graham*, 206 Ill. 2d 465, 476 (2003). For the reasons that we explain below, we find that we can dispose of defendant's claim on the first prong.

¶ 84        With respect to the first prong, "effective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994); *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984). Since a defendant is "entitled to reasonable, not perfect, representation," "mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). A defendant must overcome "the strong presumption that counsel's performance fell within [the] wide range of reasonable professional assistance." *Palmer*, 162 Ill. 2d at 476. In addition, a reviewing court may affirm on any basis found in the record. *People v. Johnson*, 2019 IL App (1st) 162999, ¶ 49; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

¶ 85        We find that defendant cannot satisfy the first prong for two reasons. First, the law was in flux on the issue he raises. Second, defense counsel had a reasonable, strategic reason for introducing defendant's prior conviction.

¶ 86                                          B. Law in Flux

¶ 87        First, the law on this issue was in flux at the time of defendant's trial and, thus, we find that counsel's performance fell within the wide range of reasonable professional assistance. See *Palmer*, 162 Ill. 2d at 476.

¶ 88    Defendant's trial occurred in March 2016. Almost three years earlier, in *People v. Aguilar*, 2013 IL 112116, ¶ 22, our supreme court stated: "we here hold that, on its face, the Class 4 form of section 24-1.6(a)(1), (a)(3)(A), (d) violates the right to keep and bear arms, as guaranteed by the second amendment to the United States Constitution." Those sections prohibited a person from carrying a gun on or about his person, except when in his or her own abode or business, if the firearm was uncased, loaded, and immediately accessible. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2008) (quoted in *Aguilar*, 2013 IL 112116, ¶ 15). Section 24-1.6(d) made the offense a Class 4 felony. 720 ILCS 5/24-1.6(d) (West 2008) (quoted in *Aguilar*, 2013 IL 112116, ¶ 15). Finding the statute facially invalid, the *Aguilar* court reversed the defendant's conviction. *Aguilar*, 2013 IL 112116, ¶ 30.

¶ 89    The original *Aguilar* decision was issued in September 2013. However, three months later, in December 2013, our supreme court modified its original *Aguilar* decision in order to limit its finding of unconstitutionality to only the "Class 4 form" of AUUW, which meant that the conviction was subject to sentencing as a Class 4 felony pursuant to section (d) of the statute. *Aguilar*, 2013 IL 112116, ¶ 22 n.3; *People v. Burns*, 2015 IL 117387, ¶ 16 (discussing the *Aguilar* modification). Two years later, in December 2015, our supreme court found that its modification of *Aguilar* was "inappropriate" and that the statute was facially invalid whether it was charged as a Class 4 felony or a Class 2 felony. *Burns*, 2015 IL 117387, ¶ 22.

¶ 90    Defendant argues that his AUUW conviction was a Class 2 felony and, thus, the statute under which he was convicted was declared facially invalid in December 2015 (*Burns*, 2015 IL 117387, ¶ 24) and that his counsel rendered constitutionally deficient assistance in March 2016 by not objecting to its use as impeachment evidence.

¶ 91    However, in June 2016, our supreme court found that "a defendant's felon status *** ceases only when the prior conviction has been properly vacated." *People v. McFadden*, 2016 IL 117424, ¶ 25. In the case at bar, defendant's prior AUUW conviction was not vacated at the time of his trial and has never been vacated.

¶ 92    In *McFadden*, our supreme court found that an AUUW conviction could serve as the basis for a charge of unlawful use of a weapon by a felon (UUWF). *McFadden*, 2016 IL 117424, ¶ 25. The appellate court had vacated a UUWF conviction based on *Aguilar*, and our supreme court reversed the appellate court and reinstated the conviction. *McFadden*, 2016 IL 117424, ¶ 1. Our supreme court explained that, while a defendant could seek to vacate his prior AUUW conviction, the fact of his felon status continued until the conviction was vacated or he was relieved of his disability by some affirmative action. *McFadden*, 2016 IL 117424, ¶¶ 21-24.

¶ 93    Thus, in 2016, an AUUW conviction could serve as the basis for another conviction. Where our supreme court found that an AUUW conviction could serve as the basis for another conviction, it was certainly reasonable for counsel to believe that it could also serve the much lesser task of serving as impeachment evidence.

¶ 94    Two years later, in *In re N.G.*, 2018 IL 121939, ¶¶ 36, 84, our supreme court overruled its decision in *McFadden*, 2016 IL 117424, and found that an AUUW conviction "cannot be used for any purpose under any circumstances." But that reversal only supports our conclusion that the law was in flux. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 173 (the claimed error was not "clear or obvious" in 2015, when defendant was impeached with a void UUWF conviction). In *McFadden*, our supreme court had observed that "courts had been grappling with the legal effect" of *Aguilar* ever since it was decided. *McFadden*, 2016 IL 117424, ¶ 13. Thus, we cannot find that trial counsel rendered constitutionally deficient performance by not

objecting to the State's motion to use defendant's AUUW conviction for impeachment purposes.[6]

¶ 95 Defendant cites a 2015 decision in which this court found that the State's use of a defendant's AUUW conviction as impeachment evidence, while not "justified," was harmless beyond a reasonable doubt. *People v. Scott*, 2015 IL App (1st) 131503, ¶ 42. In *Scott*, the defendant was accused of using a gun to murder the victim, thereby making the AUUW conviction more prejudicial than in our case. *Scott*, 2015 IL App (1st) 131503, ¶ 7. After the defendant in *Scott* testified, the State introduced, and the trial court admitted as an exhibit, a certified statement of the defendant's AUUW conviction as impeachment evidence. *Scott*, 2015 IL App (1st) 131503, ¶¶ 18, 42. The jury was instructed that it could consider the conviction in determining " 'the believability of the witness.' " *Scott*, 2015 IL App (1st) 131503, ¶ 19. Although this court found that impeachment with an AUUW conviction was not "justified," we also found the exhibit to be harmless beyond a reasonable doubt, where the State did not cross-examine the defendant about it and the State did not argue that it impeached the defendant's credibility. See *Scott*, 2015 IL App (1st) 131503, ¶ 42.

¶ 96 The facts of our case are even less compelling than the facts of *Scott*. In *Scott*, the defendant was accused of murdering with a gun, rather than a knife, thereby making the prior conviction more prejudicial. In *Scott*, the impeachment was accomplished by an exhibit, whereas in our case it was defense counsel who introduced the fact of the prior conviction during defendant's direct examination, as part of a trial strategy instead of allowing the State to do so.[7] The State's cross-examination on this topic was limited to eliciting the name of the charge, and its comment in rebuttal argument was an isolated comment. Thus, we do not find *Scott* applicable here.

¶ 97 In discussing *Scott*, defendant emphasizes that the prosecutor argued during the State's rebuttal closing that the jury could consider the fact that defendant was a convicted felon "in determining his believability." However, the transcript of the State's rebuttal closing was 20 pages long, and most of those 20 pages were devoted to offering numerous other reasons why defendant was not believable. The conviction was not even mentioned in the State's initial closing argument. Thus, we cannot find the type of conduct in this case that concerned the court in *Scott*.

¶ 98 In his brief to this court, defendant acknowledges that he "has not argued that his attorney failed to subject the State's case to meaningful adversarial testing" and argues that this one error, alone, caused his counsel's entire representation to fall below an objective standard of reasonableness. However, our "determination must be made on the basis of the entire record, not isolated instances." *People v. Hommerson*, 399 Ill. App. 3d 405, 415 (2010); *People v. Burnett*, 2019 IL App (1st) 163018, ¶ 9 ("We analyze claims of ineffective assistance of counsel by considering the entire record."). Like the trial court who considered defendant's posttrial claims of ineffective assistance of counsel, our independent review leads us to

---

[6]Defendant also argues that, in addition to ineffective assistance of counsel, we may consider this issue under the plain error doctrine. However, for the same reasons that we do not find constitutionally deficient assistance, we also do not find a clear or obvious error. See *People v. Sebby*, 2017 IL 119445, ¶ 49 (the "initial analytical step" under the plain error doctrine is to determine "whether there was a clear or obvious error").

[7]On direct examination, defendant testified that he had a criminal conviction for gun possession in 2004, that he was on parole in 2006, and that he was "on house arrest" at Senior's house.

conclude that trial counsel rendered competent performance throughout the proceedings.

¶ 99                              C. Strategic Reason

¶ 100     Second, we find that defendant has failed to overcome the presumption that his counsel had a sound trial strategy for not objecting to the State's use of defendant's prior conviction and for introducing it himself during defendant's own case-in-chief.

¶ 101     To establish the first prong, a defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011); *Johnson*, 2019 IL App (1st) 162999, ¶ 58; *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123. Matters of trial strategy are generally immune from claims of ineffective assistance of counsel. *Manning*, 241 Ill. 2d at 327; *Johnson*, 2019 IL App (1st) 162999, ¶ 58; *Banks*, 2016 IL App (1st) 131009, ¶ 123. Although a choice or argument by counsel may not ultimately succeed, selecting which issues to argue is generally viewed as the result of trial strategy and, thus, immune from an ineffectiveness claim. *Johnson*, 2019 IL App (1st) 162999, ¶¶ 62, 65 (rejecting defendant's ineffectiveness claim that trial counsel did not " 'clearly articulate' " and pursue a particular argument).

¶ 102     In the case at bar, counsel had a legitimate strategic reason for introducing defendant's prior conviction during defendant's case-in-chief, namely, to explain why defendant did not move out if the tension in the house was as bad as he claimed. On cross-examination, the State asked why defendant continued to live with Senior and Junior, if there really were such tensions. The prosecutor argued that "[n]othing stopped" him from moving in with his girlfriend after the argument in late August 2007, which ended with Senior, Junior, and defendant not being on speaking terms and trying to avoid each other in the same house. In response, defendant explained that he had no choice but to stay because of the terms of his parole. In the months before the murders, defendant was packing up his things in the hope of moving out and was trying to change the terms of his parole so that he could move, but the change had not been approved.

¶ 103     Without introducing the fact of defendant's most recent conviction, none of this explanation would have made sense. Although a strategic choice is not ultimately successful and a defendant is found guilty, hindsight is not the yardstick of reasonable performance. See *Johnson*, 2019 IL App (1st) 162999, ¶ 60 (although a choice by counsel "may not ultimately succeed," making those choices is generally viewed as trial strategy).

¶ 104     For the foregoing reasons, we are not persuaded that trial counsel provided constitutionally defective assistance. Since we do not find the first *Strickland* prong satisfied, we do not need to consider the second. *Graham*, 206 Ill. 2d at 476 (if an ineffective-assistance claim "can be disposed of" on one prong, we "need not determine" the remaining prong).

¶ 105              III. Second Degree Murder Based on Mutual Combat

¶ 106     Defendant argues that, although the trial court instructed the jury regarding second degree murder based on an unreasonable belief in the need for self-defense, the trial court erred by denying his request to also instruct the jury regarding second degree murder based on mutual combat.

¶ 107     "[W]hen the trial court, after reviewing all the evidence, determines that there is insufficient evidence to justify the giving of a jury instruction, the proper standard of review

- 19 -

of that decision is abuse of discretion." *McDonald*, 2016 IL 118882, ¶ 42; *People v. Eubanks*, 2019 IL 123525, ¶ 72.

¶ 108    A person commits second degree murder when he or she commits first degree murder and one of two mitigating factors is present. *McDonald*, 2016 IL 118882, ¶ 59. The first factor is an unreasonable belief in the need for self-defense. *McDonald*, 2016 IL 118882, ¶ 59. In the case at bar, the trial court gave an instruction on this factor. The second mitigating factor is that, at the time of the murder, the defendant was acting under a sudden and intense passion resulting from a serious provocation. *McDonald*, 2016 IL 118882, ¶ 59. A serious provocation is defined as conduct sufficient to excite an intense passion in an otherwise reasonable person. *McDonald*, 2016 IL 118882, ¶ 59. The only acts that have been recognized by our supreme court as constituting a serious provocation are (1) substantial physical injury or substantial physical assault, (2) mutual combat, (3) illegal arrest, and (4) adultery. *McDonald*, 2016 IL 118882, ¶ 59.

¶ 109    Of these four categories, defendant claims that the jury should have been instructed on mutual combat. Mutual combat has been defined as (1) "a fight or struggle that both parties enter willingly" or (2) "where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *McDonald*, 2016 IL 118882, ¶ 59.

¶ 110    Even though self-defense and mutual combat may not be mutually exclusive in certain cases, there must still be "some evidence" of mutual combat for the instruction to be given. See *Eubanks*, 2019 IL 123525, ¶ 72; *McDonald*, 2016 IL 118882, ¶ 25. "When determining whether a defendant is entitled to a jury instruction on a lesser included offense, the trial court is to consider whether there is some evidence in the record that, if believed by the jury, will reduce the crime charged to a lesser offense." *Eubanks*, 2019 IL 123525, ¶ 72. Our supreme court has found no evidence of mutual combat where one party did not enter the fight willingly and where the fight between two combatants was not on equal terms. *McDonald*, 2016 IL 118882, ¶ 62.

¶ 111    Defendant argues that the evidence of mutual combat is his own testimony that, after his uncle initially came at him with a knife, the altercation became one of mutual combat. The problem with this argument is that defendant consistently testified at trial that he was acting out of self-defense. Thus, he cannot argue now that he entered the fight willingly.

¶ 112    As for mutual combat on equal terms, our supreme court has found that an "emphasis on the relative physical size of the parties is misplaced." *McDonald*, 2016 IL 118882, ¶ 62. "Rather, the provocation must be proportionate to the manner in which the accused retaliated." *McDonald*, 2016 IL 118882, ¶ 62. Thus, for example, the supreme court found a lack of proportion where the defendant suffered only lacerations and scrapes, while the victim suffered multiple and fatal knife wounds. *McDonald*, 2016 IL 118882, ¶ 65. Similarly, in the case at bar, the victims' necks were slashed, while defendant suffered mainly some lacerations to his hands. In contrast to defendant's relatively minor wounds, the victims suffered multiple stab and incised wounds that severed their carotid arteries and jugular veins, as well as defensive wounds to their hands. Thus, we cannot find that the trial court abused its discretion by denying an instruction on one type of second degree murder while still providing an instruction on the type that defendant had testified about.

¶ 113                                        IV. Cumulative Error

¶ 114        Lastly, defendant argues that, even if the errors that he already argued do not by themselves rise to the level of reversible error, they cumulatively rise to the level of reversible error. However, since we do not find error in the claims that he asserted, there is no cumulative error to consider.

¶ 115                                          CONCLUSION

¶ 116        Our supreme court has found that courts have an affirmative and independent duty to invalidate unconstitutional AUUW convictions and "may do so *sua sponte*." *N.G.*, 2018 IL 121939, ¶¶ 42, 57; see also *Cross*, 2019 IL App (1st) 162108, ¶¶ 183-87 (vacating a prior AUUW conviction based on *N.G.*, 2018 IL 121939, ¶ 57). Thus, we hereby vacate defendant's prior AUUW conviction. However, there is no need to remand for resentencing, since defendant received a mandatory sentence of life in prison.

¶ 117        For the foregoing reasons, we affirm defendant's conviction and sentence and vacate his prior AUUW conviction.

¶ 118        Affirmed.