2021 IL App (1st) 173127-U

No. 1-17-3127

Order filed March 25, 2021

Fourth Division

**Notice:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 07776 |
| LAMONTE MORBLEY, | ) ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding |

JUSTICE MARTIN delivered the judgment of the court.
Justice Lampkin and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defense counsel's failure to object to the prosecution's questioning of defendant on cross-examination regarding his juvenile adjudication did not deprive him of the effective assistance of counsel. Defendant, who was seventeen years old at the time of the offense, is entitled to a new sentencing hearing based on *People v. Buffer*, 2019 IL 122327, which was decided after defendant was sentenced in this case.

¶ 2    Following a bench trial, defendant LaMonte Morbley was convicted of first degree murder for fatally shooting Quentin Thompson and sentenced to 44 years' imprisonment. Morbley appeals both his conviction and sentence arguing: (1) his trial counsel failed to provide effective assistance by not objecting to questions regarding his juvenile probation when the State cross-examined him;

and (2) his 44-year sentence violates the eighth amendment because the trial court did not make the requisite findings to impose a *de facto* life sentence on a juvenile offender. We affirm his conviction and remand for a new sentencing hearing.[1]

¶ 3                                                    FACTS

¶ 4        Morbley was indicted for the first degree murder and attempted armed robbery of Quentin Thompson on March 28, 2015. When a jury trial was initially set to begin, Morbley entered a guilty plea to first degree murder with a prison term of 32 years under a negotiated plea agreement reached in a conference in accordance with Supreme Court Rule 402, but the trial court withheld imposing the sentence that day and ordered a pre-sentence investigation. On the next court date, Morbley orally requested to withdraw his plea. After Morbley personally addressed the court to explain the reasons for his request, the trial court granted Morbley's request and allowed him to withdraw his guilty plea. Later, when a jury trial was again set to begin, the Defense asked for a continuance explaining to the court that Morbley informed counsel just the day before about a "bounty on his head" at the time of the shooting. The Defense wished to investigate the matter and amend its answer to discovery to plead self-defense based on the bounty.[2] The trial judge addressed Morbley directly who confirmed that he had only told his lawyers about the bounty the day before the scheduled jury trial. The court granted the continuance and allowed the Defense to file an amended answer asserting self-defense. Morbley later waived his right to a jury trial and was tried by the court.

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] The initial answer to discovery asserted self-defense based on the claim that Thompson pulled a gun and threatened Morbley first. The Defense later withdrew that answer and filed an amended answer asserting the State could not prove Morbley was the offender.

¶ 5    We summarize the evidence adduced at trial as follows. LaMonte Morbley was hanging out with his younger brother Demetrius Upshaw (Meechie) and friends Darion Jones and Ron Ron[3] at a corner store located in Chicago at 89th and Cottage Grove on the morning of March 28, 2015.[4] Meechie remained in the store while the other three crossed the street to hang out in front of Darion's apartment building. A short time later, Quentin Thompson entered the store. Quentin asked Meechie where he could buy some weed and Meechie pointed across the street at the group that included LaMonte. Meechie opened the door and yelled to the group that someone in the store wanted to buy weed. Darion responded, "We got it." Quentin bought something from the store, thanked Meechie on his way out, and walked toward LaMonte's group.

¶ 6    Darion went inside the apartment building and came out a short time later. He handed something[5] to LaMonte who was walking past the building with Ron Ron. Darion then rejoined Meechie on the sidewalk near the corner store.

¶ 7    Quentin went to the rear of the apartment building where LaMonte and Ron Ron were standing. LaMonte stood still as Quentin slowly walked toward LaMonte holding a mobile phone to his ear with his shoulder. Quentin's hands were in front of him about waist height and he was handling something, likely cash. Ron Ron walked behind Quentin and then off to Quentin's right after Quentin stopped in front of LaMonte who had taken two steps toward Quentin. LaMonte then reached into his coat pockets. A few seconds later, LaMonte grabbed Quentin's right arm with his left hand and pointed a gun that he drew from his coat pocket at Quentin with his right hand. At the same time, Ron Ron punched Quentin in the head. Quentin then pulled away and tried to run,

---

[3] The record does not reveal Ron Ron's actual name.

[4] Trial testimony and the parties' briefs mostly refer to the people involved by their first or nickname. Because several people are mentioned, we will likewise use first or nicknames after introduction in this section.

[5] In a handwritten statement, Johnnie Prude said he saw Darion hand LaMonte a gun in the video. Darion told a grand jury he handed LaMonte "seals"—small packages of marijuana. The handoff was captured on video and the item Darion hands LaMonte is not clearly visible. LaMonte put it in his right coat pocket. In a different video from moments later, LaMonte pulls a gun from his right coat pocket. Darion was not charged in this case.

but LaMonte held on to his arm. LaMonte, ended up behind Quentin and shot him in the upper back. Quentin fell to the ground and LaMonte walked away. Ron Ron then rifled through Quentin's pockets before running away.

¶ 8       These events were captured on video surveillance from inside the store and outside the apartment building. LaMonte shot Quentin in less than five seconds from the moment Quentin arrived in front of him. All the videos show LaMonte wearing a distinctive red and black jacket with Pelle Pelle logo. Johnnie Prude, a maintenance worker for the apartment building and cousin of LaMonte, identified LaMonte, Darion, and Meechie in the videos according to a handwritten statement he gave police and an Assistant State's Attorney the night of the shooting. In both a videotaped statement and grand jury testimony, Meechie admitted that he directed Quentin to LaMonte after Quentin asked him where he could buy some weed. Also before a grand jury, Darion gave an account consistent with Meechie's and testified he went into the apartment building to retrieve some "seals"—small packages of marijuana—and delivered them to LaMonte outside.

¶ 9       At trial, Johnnie, Meechie, and Darion all claimed they either did not remember giving their prior statements or parts thereof or disavowed some particulars. Most illustrative, Meechie stated he did not remember anything because he overdosed on ecstasy and was "in the twilight zone" for three months.

¶ 10      Quentin's girlfriend, LaPorche Roberson testified Quentin had left that morning to buy cigarettes from the corner store. She identified him in the videos from the store and behind the apartment building.

¶ 11      Paramedics found a wounded Quentin behind the apartment building and took him to Northwestern Hospital where he died a few days later from a single gunshot wound to the upper

back. Investigators found a single fired .40 caliber cartridge casing, a few coins, and a mobile phone in the area where the paramedics had found him.

¶ 12    The videos depict Quentin holding a mobile phone to his ear or wedged between his ear and shoulder. LaPorche said the phone belonged to her and Quentin was using it to speak with his sister when he left their apartment. LaPorche identified her mobile phone in a close-up photo of the area behind the apartment building.

¶ 13    After gathering video from the store and apartment building and witness statements identifying LaMonte as the shooter, police sought and obtained a warrant for LaMonte's arrest. LaMonte was apprehended in Dubuque, Iowa and Chicago Police detectives travelled there and brought him back to Illinois where he was subsequently indicted.

¶ 14    LaMonte testified in his own defense. He dropped out of high school after his sophomore year and got "caught up in the streets" selling drugs. A supplier known as Five-O fronted him a pound of marijuana but LaMonte did not pay him when asked. Later, LaMonte heard rumors there was a $20,000 to $40,000 bounty on his head (sum offered for killing him) but was unsure if the bounty stemmed from not paying Five-O, rivalry with other drug dealers, a "rap beef," or some combination of the three. In any event, word of the bounty caused LaMonte to fear for his safety and he went with his girlfriend to Dubuque, Iowa in March of 2014.

¶ 15    According to LaMonte, he was "forced" to return to Chicago after he pled guilty in exchange for a two-year term of probation in a juvenile case in Iowa. The terms of his probation required him to stay with a legal guardian: for LaMonte, his mother in Chicago. Upon returning to Chicago in February of 2015, LaMonte heard the bounty was still offered.

¶ 16    On the morning of March 28, 2015, a customer named Rhonda called LaMonte about buying some weed from him. Later that morning, he was hanging out with Meechie, Darion, and

Ron Ron at the corner store while exchanging text messages with Rhonda to finalize the meeting place for their transaction. LaMonte left the store to meet Rhonda behind the apartment building. Ron Ron tagged along uninvited. LaMonte said he had only met Ron Ron after returning from Iowa and this was their second or third interaction.

¶ 17    LaMonte was carrying the gun to protect himself "if anything came [his] way." He explained that he was fearful in Chicago because he had been shot at ten times before. He went on to describe only three instances, none of which were shootings directed at him personally.

¶ 18    As he waited behind the apartment building, LaMonte saw a man wearing dark, baggy clothing and talking on a mobile phone walk toward him. LaMonte explained he has poor vision and was not wearing glasses or contact lenses at the time. He could not see Quentin's face until they were five feet apart but LaMonte did not recognize Quentin at all. No one had told LaMonte someone was coming to see him.

¶ 19    Quentin asked LaMonte, "Big Boy, you got some weed?" LaMonte replied, "yeah." His account continued:

> "Things kinda got shook up because I didn't recognize him . . . And it was like a jittery-type movement, not familiar. Things unfolded, me not recognizing the guy, we got into like a tussle."

When asked to explain what he meant by "jittery-type movement," LaMonte said:

> "acting like weird, for a guy to walk up and ask do you have any marijuana and he's not a regular customer . . . so for this guy that I don't know to walk up to me, it was kinda weird for me."

LaMonte further testified that it was not normal for someone he did not know to approach him and ask to buy weed. He had never sold drugs to someone he did not know or recognize before. LaMonte continued:

"I had reacted based off of me being afraid of the situation, it was like a weird situation. There was a feeling inside me that – that lead to me pulling out a gun and we had gotten into a tussle, you know."

LaMonte testified "that feeling inside" of him was fear. He was afraid he could have been "robbed or shot or something" because of the bounty and an unknown person was approaching him. LaMonte hoped he could scare Quentin and make him back away. But:

"He came forward, he came towards me a little bit, and that's when we got into, like, a tussle . . . Ron Ron had punched him and the gun had went off.

* * *

I guess I grabbed onto him and then he got to backing up some, Ron Ron punched the guy and the gun had gone off."

After shooting Quentin, LaMonte was scared more guys could be coming so he ran away.

¶ 20    According to LaMonte, he was not trying to rob Quentin; he had not planned to shoot Quentin; and he did not intend to fire the gun or kill Quentin: he was only trying to protect himself and would not have pulled the gun if he had not been in fear for his life.

¶ 21    On cross-examination, LaMonte confirmed the charge underlying his juvenile adjudication and probation from Iowa was intimidation with a dangerous weapon. He also acknowledged his probation did not allow him to carry a firearm or sell drugs. LaMonte admitted he resumed selling drugs in Chicago within a week after returning from Iowa and he obtained a gun "off the streets" for $150 on his second or third day back. The gun was a Glock .40 caliber semiautomatic pistol and did not have a safety. When shown the video, LaMonte agreed Quentin was holding a phone to his ear with his shoulder and counting money with his hands just before the shooting.

¶ 22    The trial judge observed that the events at issue in the case were almost entirely shown on the surveillance video admitted into evidence and little witness testimony was required to fill in the blanks about what happened. Rather, witness testimony was most significant in this case to

identify who was shown in the videos. In prior statements, Johnnie, Darion, and Meechie all identify the person wearing the black and red Pelle Pelle jacket in the video who shot Quentin as LaMonte. The court found their professed lack of memory and trial testimony inconsistent with prior statements attributable to their affiliation with LaMonte. Accordingly, the trial judge credited their prior inconsistent statements admitted for impeachment and as substantive evidence under 725 ILCS 5/115-10.1 (West 2012).

¶ 23    Next, the trial judge summarized LaMonte's testimony, which offered to explain why he left Chicago and why he returned. The court noted, however, that by his own account, LaMonte promptly returned to the same criminal activity that he said caused him to leave Chicago in the first place. Further, the court observed, LaMonte introduced his juvenile adjudication and the fact he was on probation, not the State. Thus, the court found LaMonte's direct testimony opened the door to questioning about it: "normally state's attorneys should not be cross-examining defendants about their prior convictions, but in this case, the defendant himself fronted it and brought it out and put it in play . . ." Even so, the court remarked, "I will consider the testimony about his prior conviction as it may impact his credibility and also about the fact that it explains why he was going back and forth to Iowa from Chicago, but the fact that he was convicted there is not evidence of the offense for which he's charged in this case."

¶ 24    Then, the trial judge found the shooting was "totally unjustified" and "gratuitous." In addition, the judge found LaMonte's self-defense claim was not credible: the court observed LaMonte claimed to be afraid because unknown people were after him, yet he continued to sell drugs—an activity that would likely cause him to encounter people he did not know. The court further noted that the video evidence and testimony did not show Quentin did anything that could reasonably indicate he was a threat to LaMonte. To the contrary, the court found Quentin "did

nothing except walk towards [LaMonte] with some money in his hands which he was trying to give [LaMonte], apparently for some marijuana." Apart from that, the court found the evidence ambiguous whether LaMonte and Ron Ron were attempting to rob Quentin. Accordingly, the court found LaMonte guilty of first-degree murder, but acquitted him of attempted armed robbery.

¶ 25    At the subsequent sentencing hearing, the court heard testimony from family members of both Quentin and LaMonte. In allocution, LaMonte repeated that he did not mean to kill Quentin; he was only afraid to be approached by a stranger due to the bounty on his head. The court expressly declined to impose a discretionary firearm enhancement and sentenced LaMonte to 44 years' imprisonment.

¶ 26                                    ANALYSIS

¶ 27                            A. Ineffective Assistance

¶ 28    Morbley[6] claims his trial counsel was ineffective for not objecting to questions the State asked him on cross-examination regarding his juvenile probation from Iowa. Specifically, he asserts counsel should have objected to the prosecutor's questions about: whether his probation stemmed from a charge of intimidation with a dangerous weapon; whether the terms of his probation prohibited him from possessing a firearm or selling drugs; and how soon he obtained a weapon or sold drugs after returning to Chicago. Morbley argues these questions and their answers pertained to crimes other than those for which he was on trial and had no purpose other than to attack his character. Moreover, he contends the prosecutor referenced these crimes in closing argument and the trial judge relied on them to find Morbley not credible and thereby reject his claim of self-defense.

_____

[6] We resume using the defendant's last name.

¶ 29    To establish that a defendant was deprived of his constitutional right to the effective assistance of counsel, the defendant must satisfy the two-pronged *Strickland* test: he must show (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability the result of the proceeding would have been different, but for counsel's errors. *People v. Peterson*, 2017 IL 120331, ¶ 79, citing *Strickland v. Washington*, 466 U.S. 668 (1984). Since a defendant must satisfy both prongs of the *Strickland* test, we may dispose of such claims upon finding the defendant has not met one prong without considering the other. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 83.

¶ 30    When a defendant claims he was prejudiced by his counsel's failure to do something, we generally consider the likelihood of a different result if counsel had taken the action. See, *e.g.*, *People v. Valladares*, 2013 IL App (1st) 112010, ¶ 70 (to show prejudice resulting from counsel's failure to file a motion to suppress, a defendant must show a reasonable probability that: (1) the motion would have been granted, and (2) the outcome of the trial would have been different had the evidence been suppressed); *People v. Golden*, 229 Ill. 2d 277, 283 (2008) (court considers probability of whether the appeal would have been successful had appellate counsel raised an issue to determine if defendant was prejudiced by not raising it). Further, when assessing a claim that counsel failed to render effective assistance, we consider the entire record, not isolated instances. *Williams*, 2020 IL App (1st) 162512, ¶ 98. With these principles, we consider whether there is a reasonable probability that the outcome of Morbley's trial would have been different had his counsel objected to the prosecutor's questions regarding his juvenile probation.

¶ 31    Morbley argues the prosecutor's questions were objectionable because they solicited evidence of other crimes and "[h]ad counsel objected, this character evidence would not have been admitted." We disagree.

¶ 32　　　　Foremost, the questions only pertained to other crimes Morbley had already introduced into evidence through his direct testimony. On direct, Morbley testified he was on probation from a juvenile adjudication in Iowa, that he was going to meet a customer to sell them marijuana on the morning of the shooting, and that he was armed with a handgun at the time. By that testimony, Morbley admitted to committing other crimes. So even if the prosecutor had not asked further questions, evidence of Morbley's other crimes was already admitted. Likewise, this testimony made readily apparent that Morbley violated his probation: drug selling and juvenile gun possession are crimes in themselves and a defining feature of probation from any jurisdiction conditions a defendant's liberty on his refraining from criminal activity during the probationary period.

¶ 33　　　　Further, the prosecutor's questions only solicited clarification about facts and circumstances attendant to each crime; the offense underlying the juvenile adjudication, when he resumed drug dealing, and when and how he obtained a gun. If Morbley's counsel had objected, there is no reasonable probability the objections would have been sustained. When a defendant testifies on his own behalf, he subjects himself to legitimate cross-examination. *People v. Stevens*, 2014 IL 116300, ¶ 16. The scope is generally limited to the subject matter inquired into on direct examination, but the cross-examiner may "develop all circumstances within the knowledge of the witness that explain, qualify, discredit or destroy his direct testimony, even if such examination constitutes new matter that aids the cross-examiner's case." *Id*. This includes any permissible matter that affects the witness's credibility. *Id*. The prosecutor's questions here were proper for these purposes.

¶ 34　　　　In addition, self-defense puts whether a defendant believed he was threatened with imminent force and the reasonableness of that belief at issue. In his direct testimony, Morbley's

other crimes were integral to why he believed he was threatened with imminent force. Morbley claimed he was afraid because he did not pay a supplier in his past drug dealing (a crime) and heard there was a bounty. He was so afraid, he claimed, that he left Chicago to live in Iowa. He only returned because it was required by the terms of his juvenile probation for intimidation with a dangerous weapon (another crime). Feeling he needed protection, Morbley obtained a handgun (more crime) within days of his return to Chicago. Then, while Morbley was waiting to meet a customer to sell her drugs (even more crime), he encountered Thompson walking toward him instead of the customer he was expecting. In the past, Morbley always knew or recognized his customers when he sold them drugs (multiple crimes). According to Morbley, it was only because of these circumstances that he was afraid of Thompson and pulled his gun, which led to the tussle and shooting. Thus, in his direct testimony, Morbley made his other crimes probative of whether he acted in self-defense, reasonably or unreasonably. The prosecutor's questions were probative of the same issues and aimed at the credibility of Morbley's claimed belief in the need to use deadly force in self-defense; the cross-examination was not aimed at Morbley's credibility in general or used to suggest he was guilty simply because he was selling drugs and obtained a gun right after being placed on juvenile probation and therefore was a bad person with a propensity to commit crime. See *People v. Pikes*, 2013 IL 115171, ¶ 13 (evidence of other crimes is not admissible if merely relevant to show the defendant's propensity to commit crime, that he is a bad person). Because Morbley's other crimes were essential to his self-defense claim, the prosecutor's questions about them were proper. Simply stated, a defendant cannot offer his criminal activity as a justification for his conduct and then reasonably expect he cannot be questioned about it. See *id*. ¶ 17, quoting *Fitzpatrick v. United States*, 178 U.S. 304, 315 (1900) (a defendant "has no right to

set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts").

¶ 35        Morbley likens his case to *People v. Villa*, 2011 IL 110777, in which the supreme court found reversible error when a juvenile adjudication was introduced to impeach a testifying defendant. In *Villa*, the defendant disavowed parts of a statement he gave to detectives implicating himself in a drive by shooting. *Id.* ¶ 12. When asked why he would sign a statement containing false information, Villa replied, in part, that he had never been in a situation like that before. *Id.* ¶ 13. On cross-examination, the State asked him about being questioned by and giving a statement to the same detectives 18 months before regarding an unrelated burglary. *Id.* ¶ 14. Villa said the situations were "nowhere near the same." *Id.* In rebuttal, the State published a copy of Villa's juvenile adjudication that resulted from the earlier burglary and referenced it twice in closing argument as a basis to find Villa's trial testimony untruthful. *Id.* ¶ 15. The supreme court found juvenile adjudications are typically not admissible against a testifying defendant and Villa's testimony that he had "never been in a situation like this before" was not an attempt to mislead the jury about his criminal background and, therefore, did not open the door to admission of his juvenile adjudication. *Id.* ¶¶ 2, 50-51. In addition, Villa's statement was the only evidence implicating him in the offense, so the erroneous admission of the juvenile adjudication may have led the jury to find his trial testimony recanting the statement incredible. *Id.* ¶¶ 55-59.

¶ 36        We find *Villa* readily distinguishable from this case. In *Villa*, evidence related to the defendant's juvenile adjudication was only introduced by the State on cross-examination and in rebuttal. Here, Morbley introduced his juvenile adjudication in his direct testimony. Moreover, the evidence related to the juvenile adjudication in *Villa* was offered for impeachment only. As we have explained in this case, the evidence related to Morbley's juvenile adjudication was

intertwined with his claimed defense; it was not offered solely for impeachment. Evidence of other crimes is admissible when, like here, it "inextricably intertwined" or "part and parcel" of the charged offense. See, *e.g.*, *People v. Morales*, 2012 IL App (1st) 101911, ¶ 24. Apart from that, Morbley had a bench trial, not a jury trial. The concern underlying the rule against admission of evidence of other crimes is that such evidence could "over persuade" a jury and lead them to convict merely because they feel the defendant is a bad person who deserves to be punished. *Pikes*, 2013 IL 115171, ¶ 16. But in a bench trial, this fear is assuaged; it is presumed that the trial court considered the other-crimes evidence only for the limited purpose for which it was introduced. *People v. Nash*, 2013 IL App (1st) 113366, ¶ 24. We need not rely on presumption in this case. The trial court expressly considered Morbley's other crimes for proper purposes. The court's remarks show it did not find Morbley incredible simply because he had a juvenile adjudication; rather, Morbley was not credible because his admitted conduct of returning to drug selling in Chicago was inconsistent with his avowed reason for leaving Chicago and the video belied that Morbley shot Quentin Thompson in self-defense. Furthermore, the evidence implicating Morbley did not hinge on a confession or his credibility as in *Villa*.

¶ 37    Indeed, the video shows Morbley stood casually for some time as Quentin approached him and his companion, Ron Ron, walked behind. Morbley initiated physical contact with Quentin and Quentin made no "jittery-type movement" before. The only "tussle" that occurred was Quentin's struggle to get away while Morbley held him by the arm and pointed a gun at him. The video totally contradicts that Morbley believed, reasonably or unreasonably, that he was in danger and shows that Morbley was the aggressor. He did not kill Quentin in self-defense.

¶ 38    In sum, since the State's questioning was proper based on Morbley's direct testimony, any objections should and would have been overruled and there is no reasonable probability the trial

would have resulted differently. Therefore, counsel's failure to object did not prejudice Morbley. Accordingly, we affirm his conviction for first degree murder.

¶ 39                                  B. Sentencing

¶ 40        Morbley was seventeen years of age at the time he murdered Quentin Thompson. The legal parameters governing sentencing for offenders who commit homicide offenses as juveniles has been in flux since the United State's Supreme Court decided *Miller v. Alabama*, 567 U.S. 460 (2012). In *Miller*, the Court held the eighth amendment prohibits mandatory life without parole for convicted juveniles and a life sentence should be reserved for only the rarest of juvenile who demonstrates "irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *People v. Holman*, 2017 IL 120655, ¶ 46. Later, our supreme court extended the same protection to juveniles who receive prison terms that amount to the functional equivalent of life without parole, termed *de facto* life. *People v. Reyes*, 2016 IL 119271, ¶¶ 9-10. At the time the trial court sentenced Morbley, the law was unsettled on what exactly constituted a *de facto* life sentence. Our supreme court resolved the issue after Morbley was sentenced in *People v. Buffer*, 2019 IL 122327. In *Buffer*, the court found a *de facto* life sentence for a juvenile is over 40 years. *Id.* ¶ 40-41.

¶ 41        In this case, Morbley asserts his 44-year sentence amounts to *de facto* life without parole and the trial court did not make the requisite findings to impose such a sentence. The State concedes this argument.[7] Based on *Buffer* and our review of the record, we agree that Morbley is entitled to a new sentencing hearing.

---

[7] Morbley made additional arguments related to his sentence but withdrew them upon the State's concession of this issue.

¶ 42                                    CONCLUSION

¶ 43      Based on the foregoing, we find Morbley was not deprived of the effective assistance of counsel by failing to object to questions regarding his juvenile adjudication, which he testified to on direct examination in support of his claim of self-defense. We also find Morbley's 44-year prison term is a *de facto* life without parole sentence imposed without the requisite findings. Accordingly, we affirm the conviction, vacate the sentence, and remand for a new sentencing hearing.

¶ 44      Affirmed in part and vacated in part.

¶ 45      Cause remanded.