2024 IL App (1st) 211251-U

FIFTH DIVISION
February 16, 2024

No. 1-21-1251

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 13 CR 6374 |
| JULIO GARCIA, | ) ) ) | Honorable Kerry M. Kennedy, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Mitchell and Justice Navarro concurred in the judgment.

**ORDER**

¶ 1   *Held*: Defendant's convictions for predatory criminal sexual assault are affirmed where the trial court did not deprive defendant of a fair trial by limiting evidence concerning allegations of sexual abuse regarding other minors.

¶ 2   Following a bench trial, defendant Julio Garcia was convicted of four counts of predatory criminal sexual assault (PCSA) against his stepdaughter and sentenced to four consecutive prison terms of 11 years. On appeal, Mr. Garcia contends that the court deprived him of a fair trial by limiting evidence that his ex-wife Iwona Garcia (Iwona) made complaints against him of child sexual abuse of their own children. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     Mr. Garcia was charged with multiple counts of PCSA allegedly committed against J.K., Iwona's daughter and Mr. Garcia's stepdaughter, between January 1, 2008, and December 24, 2008, when she was under 13 years old (720 ILCS 5/12-14.1(a)(1) (West 2008)).

¶ 5     Just before the 2018 trial, the State made an oral motion *in limine* to bar statements from any witnesses about allegations made by Mr. Garcia's biological children that he "engaged in inappropriate sexual conduct with those children." Specifically, the State suggested that Mr. Garcia intended to introduce hearsay statements through the Calumet City Police Department and "other witnesses" regarding these other allegations of sexual abuse that Iwona had made against Mr. Garcia. The State argued that this evidence was inadmissible hearsay and irrelevant to the case regarding J.K.

¶ 6     Defense counsel told the court that Iwona had threatened to accuse Mr. Garcia of "molest[ing] [his] children" if he did not increase child support. Counsel characterized those allegations against Mr. Garcia as false. Counsel wanted to be able to impeach Iwona with evidence about these complaints if she denied them and said there were reports from the police and the Department of Children and Family Services to use as impeachment.  Counsel argued that the statements were relevant to the defense's theory that Iwona was using allegations that Mr. Garcia abused children, including his own, to obtain more child support from Mr. Garcia.

¶ 7     The court granted the State's motion *in limine*, finding the evidence was irrelevant to the case regarding J.K.: "[Y]ou're trying to lasso in other alleged victims *** into this case. They're not part of this case."

¶ 8     During opening statements at trial, defense counsel mentioned that Iwona sought more child support in 2012, and the State objected based on the court's ruling on its motion *in limine*.

Defense counsel responded that the ruling *in limine* concerned "the molestation of [Mr. Garcia's] children" while defense counsel was making an argument about Iwona seeking more child support, and that Mr. Garcia would testify that once child support was reduced rather than increased, Iwona "started calling him about the molestation" of J.K. Defense counsel acknowledged that he could not "get into *the other ones* because [the court] ruled on that." (Emphasis added.) The court overruled the objection and held that Mr. Garcia could testify as counsel proposed he would because "[t]hat's different" from the evidence barred by the ruling *in limine*.

¶ 9    J.K. testified she was 19 years old at the time of trial in December 2018. Before 2010, she lived with Mr. Garcia, Iwona, N.G., and I.G. Mr. Garcia, whom J.K. identified in court, was Iwona's husband but not J.K.'s father. After N.G. was born in late July 2008, Iwona would take N.G. and I.G. to daycare when she went to work, leaving J.K. and Mr. Garcia home alone until J.K. went to school. J.K. testified that Mr. Garcia "would touch my private parts. And he would perform oral sex on me, and he would make me perform oral sex on him."

¶ 10    J.K. said that the first incident occurred in the living room as J.K. was asleep on the sofa. She awoke to Mr. Garcia standing in front of her with his pants and underwear down and his "private parts in [her] face." She turned to face the back of the sofa and went back to sleep. She later "woke up to him performing oral sex on me" and her pants and underwear pulled down. She told him to stop, and he did.

¶ 11    In another incident, J.K. testified, she was on the living room sofa, while Iwona, N.G., and I.G. were in bed. Mr. Garcia "put on a porno," or video depicting a man and woman having sexual intercourse including oral sex. He then sat down on the sofa next to J.K., unzipped his pants, pulled out his penis, and pushed her head down onto his erect penis. She pushed away, but he pushed her closer with one hand and held her hair with the other. She then performed oral sex on him. When

the oral sex ended, Mr. Garcia masturbated as he watched the video.

¶ 12    The aforesaid incidents occurred at night, but J.K. stated other incidents occurred in the morning. One morning, J.K. was in Iwona's bed waiting to go to school when she awoke to Mr. Garcia "performing oral sex on [her]." Her pants and underwear were pulled down but had not been when she fell asleep. She told him to stop, and he did.

¶ 13    J.G., who was 10 years old in 2008, was J.K.'s cousin. J.G. and J.K. went on a fishing trip with Mr. Garcia that year. At one point, Mr. Garcia told J.K. that J.G. "was going to do it too," which J.K. took to mean he "was going to make [J.G.] perform oral sex on him." J.K. was scared and angry, and told him, "no, she's not," which made him angry.

¶ 14    The day after the fishing trip, J.K. was in the living room, while Iwona, N.G., and I.G. were asleep in bed, when Mr. Garcia came into the living room and "turned on another porno." He unzipped his pants, took out his erect penis, "put his hand on [J.K.'s] head, held up [her] hair, and put [her] head toward his penis." Her mouth was on his penis for a "few minutes," until Iwona's footsteps prompted Mr. Garcia to pull up his pants and pretend to be asleep. J.K. "just stood there" as Iwona went to the bathroom and returned to bed without entering the living room. After the fishing trip, Mr. Garcia forced J.K. to perform oral sex on him "around five more" times and he performed oral sex on her "around five times."

¶ 15    J.K. never told anyone about the incidents with Mr. Garcia as they were occurring. She said that she continued having oral sex with Mr. Garcia after the fishing trip so he would not abuse J.G. In late summer or early fall of 2008, J.K. wrote a note to Iwona, which J.K. identified at trial. In the note, J.K. wrote, "Mommy I am so sorry but Julio was telling me to touch his priv[a]te part ever since I was in 1st grade when you were at work! He does that to other older women 2! Do not yell at me! P.S., Sometimes he would order nasty movies on Comcast! [J.K.'s signature] Note I

never touched his priv[a]te part."

¶ 16    J.K. testified that her note correctly stated that Mr. Garcia had been telling her to touch his private parts since she was in the first grade. She could not recall why she wrote that Mr. Garcia "does that to other older women." The "nasty movies" were the "porno" videos Mr. Garcia would show J.K. before forcing her to have oral sex. It was untrue that J.K. "never touched his private part," but she wrote that because she "was scared to come out with the full truth."

¶ 17    J.K. left the note on the sofa for Iwona to find. Iwona and J.K. then discussed the note, but J.K. did not give further details about what Mr. Garcia did to her because she was scared and ashamed. She wrote the note because she "was tired of the abuse." After her discussion with J.K., Iwona confronted Mr. Garcia, who left the home and never returned. He had visits with N.G and I.G. elsewhere.

¶ 18    In January 2013, J.K. told Iwona during an argument that Mr. Garcia forced her to perform oral sex on him and performed oral sex on her. The argument ended and they discussed what Mr. Garcia did. Sometime after the discussion, J.K. went to a police station, but did not talk to any police officers about the specifics of what had occurred with Mr. Garcia. She did discuss them with "a social worker" whose job was to "listen to kids tell their story." Nobody told J.K. what to say to that person or "to make up allegations" against Mr. Garcia, and J.K. expressly denied that Iwona had told her to do either. J.K. also testified that she knew some of Mr. Garcia's family lived in Texas, and she had been there once, before her 2008 note to Iwona.

¶ 19    On cross-examination, J.K. testified that she did not cry out when Mr. Garcia was abusing her. Except when Iwona awoke to use the bathroom, Iwona never woke up during any incident though her bedroom was near the living room. J.K. acknowledged that her statement to the social worker described four incidents. J.K. said that "[i]t happened plenty of times," but that those were

the incidents she recalled "vividly." When shown a certain photograph, J.K. identified Iwona, N.G., and I.G., but denied that she was the fourth person in the photo. J.K. denied going to Padre Island with her family in 2009.

¶ 20    Iwona testified that she married Mr. Garcia and they had two children together, N.G. and I.G. While Iwona was in the hospital in mid-2008 giving birth to N.G., Mr. Garcia stayed home. Iwona said that she came home after about three days, and saw that the cable bill was "extremely high" because "pornos [were] ordered" while she was at the hospital. Mr. Garcia did not deny ordering videos. After N.G. was born, Iwona left for work around 6 a.m., returned home about 4 p.m., and went to bed around 8 p.m. Mr. Garcia took care of J.K. while Iwona worked and slept.

¶ 21    In the fall of 2008, J.K. gave Iwona a note, which Iwona identified at trial. After reading the note, Iwona was very angry and confronted Mr. Garcia, who was fixing a car. She told him he was no longer allowed in the house, threw his belongings into bags, and threw the bags outside. Mr. Garcia then had visits with N.G. and I.G., but J.K. did not see him again. Iwona did not go to the police after the confrontation because she wanted N.G. and I.G. to "still have a father figure." When asked if she noticed any change in J.K.'s behavior before the note, Iwona acknowledged that J.K. did not want to be home alone with Mr. Garcia.

¶ 22    In January 2013, J.K. and Iwona were arguing when J.K. said "more about what *** [Mr. Garcia] did to her" and gave details about his sexual abuse of her. Iwona went to a police station the next day and later took J.K. to an advocacy center to be interviewed. She did not tell J.K. what to say in the interview.

¶ 23    On cross-examination, Iwona testified that she asked Mr. Garcia what he had done to J.K. and his face went pale and he exclaimed, "Oh, my God!" Iwona did not question J.K. about what Mr. Garcia did because both Iwona and J.K. were upset and Iwona did not want to ask J.K. "what

hurtful things were done to her."

¶ 24    Mr. Garcia and Iwona went with N.G. and I.G. to Texas twice, but J.K. accompanied them only the first time. When asked if the trips were in 2009, Iwona replied that she could not recall what year the trips occurred. When shown a photograph of a family on a beach, Iwona identified herself, N.G., and I.G. but did not recognize a fourth person in the photograph and denied that it was J.K. Iwona was also unsure that the photograph was taken in Texas, as the family went to the beach in Indiana every summer.

¶ 25    Mr. Garcia was paying child support, but Iwona did not remember asking for increased child support in July 2012. She denied telling Mr. Garcia that if he did not increase his child support, she would say he molested her daughter. She also denied telling Mr. Garcia's sister Imelda Garcia (Imelda) that "he had better pay child support or [she was] going to report him for molesting [her] daughter."

¶ 26    On redirect examination, Iwona testified that J.K. did not go to Texas with Mr. Garcia after she gave Iwona her note. On recross examination, Iwona testified to calling Mr. Garcia in January 2013 after J.K. said what he did, and Mr. Garcia fled to Texas after that call.

¶ 27    Bridgeview police detective Dan Matuszak testified that he was assigned to investigate J.K.'s allegations in January 2013. After interviewing Iwona and after a forensic interview of J.K., Detective Matuszak went to Mr. Garcia's home, learned that he had gone to Texas, and obtained a warrant for his arrest. Mr. Garcia was arrested in Texas, and he was brought to Detective Matuszak's police station on February 20, 2013. Detective Matuszak and another detective interviewed Mr. Garcia after reading him his *Miranda* rights and obtaining his written waiver of those rights.

¶ 28    In the interview, Mr. Garcia acknowledged having two children with Iwona and that

Iwona's daughter J.K. also lived in their home. When asked why he left Iwona's home in 2008, he replied that she accused him in August 2008 of "touching [J.K.] in a sexual manner" and "kicked him out of the house." In 2013, Iwona called him and accused him of touching J.K. in a sexual manner and said she would report him to the police. Shortly after that call, he went to Texas to stay with relatives. When asked how he felt about being arrested, Mr. Garcia "said that he was relieved of having this come to light," and "he needed reconciliation as far as what he had done to" J.K.

¶ 29    When Mr. Garcia was asked about "the accounts of what [J.K.] had told us," he said "she was not lying when she told the police what had happened to her." When asked if "he had forced her mouth upon his erect penis and *** had placed his mouth upon her vagina," he replied that the detectives already knew the answer and refused to give any further details. He referred to J.K. as a victim and said "that he felt like the worst person in the world for what he did."

¶ 30    After the detectives' interview, Assistant State's Attorney (ASA) Andres Almendarez also interviewed Mr. Garcia. The parties stipulated that, if called, ASA Almendarez would testify to interviewing Mr. Garcia in February 2013 regarding J.K.'s allegations against him. After being informed of his *Miranda* rights, Mr. Garcia admitted a possible sex addiction and said "he was sorry for what happened" to J.K. but declined to discuss the details.

¶ 31    The State rested, and the trial court denied Mr. Garcia's motion for a directed finding.

¶ 32    Imelda, Mr. Garcia's sister, testified that Iwona called her in July 2012 and told her "to let [her] brother know if he didn't pay up more money, that [Iwona] was going to have him locked up *** [f]or molesting his kids."

¶ 33    Mr. Garcia testified that he lived with Iwona, their two children, and Iwona's daughter J.K. until he and Iwona separated in August 2008. He was outside working on a car when Iwona

accused him of "something that her daughter had told her;" that is, that he did and said "something" to J.K. Iwona told him to leave or she would call the police. She showed him a note, which he glanced at. He asked her what she was talking about, and she reiterated that he must leave or she would call the police. He agreed to leave and was separated from Iwona since, though he had frequent visits with his two children.

¶ 34    In June 2009, Mr. Garcia went to Texas on vacation with his family and J.K., and they went to the beach. Mr. Garcia identified a photograph as one he took at the beach, and identified J.K. in the photograph. During the vacation, they visited Mr. Garcia's sister Leticia Garcia (Leticia).

¶ 35    In June 2012, Mr. Garcia received a summons in a child support action. He was paying child support directly to Iwona rather than through the court. Iwona filed the petition seeking increased support, but the court reduced his child support.

¶ 36    In December 2012, Mr. Garcia told Iwona he was going to Texas because his grandmother was dying. Iwona was angry, complaining that Mr. Garcia would not be working and thus would be unable to pay child support. He went to Texas in January 2013. About a week before he left, Iwona called him and spoke "about the child support" and "something about that [J.K.] had told her something *** about me molesting her daughter." Iwona again said she would call the police, and he mentioned that he was leaving for Texas. He was in Texas for about a week to 10 days before he was arrested. He was brought back to Illinois, arriving at a police station at about 11 a.m. on a Wednesday, where he was taken to an interrogation room and questioned by detectives.

¶ 37    Mr. Garcia testified that, before the interview, the detectives read him his *Miranda* rights. When they asked him if he knew why he was there, he answered that he had "an idea," adding, "my wife's been accusing me in the past of molesting my own kids and her kids, you know. And

I guess she finally now decided to go through with it." The detectives asked him why J.K. was accusing him but he did not admit to inappropriately touching her. He "said something" about "watching porno when [J.K.] was present" but "that was about it." He apologized "if [he] ever said anything, you know, disrespectful or, you know, perverted or awkward or strange to" J.K. He said he was "the worst person in the world," but explained at trial that it was in the context of being asked how he felt about leaving his children behind.

¶ 38    On cross-examination, Mr. Garcia acknowledged that in 2008 he was home alone with J.K. "[s]ometimes" on weekday mornings. Around late July, when Iwona was in the hospital giving birth to N.G., Mr. Garcia was at home taking care of I.G. and J.K. He admitted that J.K. may have walked in while he was watching a pornographic video in the living room. He denied asking J.K. to touch his "private parts" but admitted that he may have said "inappropriate" or "strange" things to her such as asking her to touch him.

¶ 39    Mr. Garcia testified that when he left Iwona's home, he removed his property as he still had a key, denying that Iwona threw his property outside. In the photograph of the family at a beach that Mr. Garcia had testified was from a 2009 trip to Texas, he acknowledged that the face of the person he identified as J.K. was not visible, nothing identified the beach as being in Texas, and Mr. Garcia was not visible. While he told Iwona in late December 2012 that he was going to Texas because his grandmother was "on her deathbed," he did not go to Texas until mid-January 2013 and his grandmother did not die until 2015.

¶ 40    On redirect examination, Mr. Garcia testified that he watched pornographic videos at night while his family slept. When asked why he was relieved after being arrested, he answered that he thought an investigation would resolve the matter and end Iwona's accusations.

¶ 41    The parties stipulated that Leticia would testify that Mr. Garcia "and his family," including

J.K. and Iwona, visited her in Texas in June 2009.

¶ 42    During closing arguments, defense counsel argued without objection that "this all started and the basis of all these allegations started when the child support was reduced. *** That's when [Iwona] became angry and the threats started to come out, not only to my client, but his sister." Following arguments, the court found Mr. Garcia guilty of four counts of PCSA. It found Mr. Garcia "very elusive and evasive," with "very questionable" credibility, while J.K. was "a young lady who was exploited [and] violated."

¶ 43    In his posttrial motion, Mr. Garcia challenged the granting of the State's motion *in limine* to bar evidence regarding Iwona accusing him "of molesting his two other children." Mr. Garcia claimed that "[t]he Police and DCFS found these accusations unfounded." He also claimed in a supplemental posttrial motion that the State violated his right to due process by making an oral motion *in limine* and that trial counsel was ineffective for not objecting to the oral motion and not making an offer of proof during the hearing *in limine*.

¶ 44    In October 2020, the court heard the posttrial motion. Defense counsel argued at the hearing that the court had excluded evidence that Iwona, "the mother of the complaining witness, made similar accusations against Mr. Garcia involving [his] own two children," and the "police and DCFS investigated those allegations and found them to be false." The record does not show that counsel presented the court with documentation of the investigation. Following argument, the court denied the posttrial motion, noting that Mr. Garcia testified, "[it] was able to judge his credibility, and [it] chose to find him guilty."

¶ 45    In July 2021, the trial court sentenced Mr. Garcia to four consecutive 11-year prison terms. The court denied Mr. Garcia's motion to reconsider his sentence. This appeal followed.

¶ 46                                    II. JURISDICTION

¶ 47    The trial court denied Mr. Garcia's motion to reconsider his sentence on September 27, 2021, and Mr. Garcia timely filed his notice of appeal on September 28, 2021. We have jurisdiction over this appeal pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Mar. 12, 2021), governing appeals from final judgments in criminal cases.

¶ 48                                    III. ANALYSIS

¶ 49    On appeal, Mr. Garcia contends that the trial court denied him a fair trial by, on the State's motion *in limine*, excluding evidence that Iwona contrived prior complaints against him of child sexual assault. Mr. Garcia contends that the court deprived him of "the chance to present a meaningful defense to the charges against him and prevented counsel from conducting a complete cross-examination of Iwona." Among other things, Mr. Garcia argues that these complaints regarding the other children never resulted in charges against him and that he would have been able to show that when the complaints regarding his own children did not result in charges against Mr. Garcia, Iwona went to the police with the charges regarding J.K.

¶ 50    As a threshold matter, we must address the state of the record in this case. Mr. Garcia brought a motion in this court for leave to file a supplemental record, arguing that the "supplemental record consists of official court documentation not included with the record filed" earlier. On this representation, this court granted leave to file a supplemental record on October 24, 2022. The supplemental record consists of what is labeled as an "Incident Report attached to the State's Motion in Limine before trial (received from Alex Pina)." The parties stipulated to the certification of the document by the clerk of the circuit court. The document is an incident report prepared by the Calumet City Police Department.

¶ 51    However, the record contains no written motion *in limine* by the State, and the transcript indicates that the motion was made orally. There is no indication in the record that the "Incident Report" was ever presented to the trial court as an attachment to a motion, in an offer of proof, or in any other manner. While the parties stipulated to the certification of the documents in the supplemental record by the clerk of the circuit court, the State reserved the right to object.

¶ 52    It appears that the document submitted in the supplemental record was not before the trial court. We therefore conclude that we improvidently granted leave to file a supplemental record. The record may be supplemented only with documents that were actually before the trial court. *People v. Gomez-Ramirez*, 2021 IL App (3d) 200121, ¶ 15. We shall consider Mr. Garcia's contention that he "should have been allowed to present evidence that Iwona made allegations of sexual abuse against [him] several months earlier, but that those allegations were determined to be unfounded" only upon the record and evidence the trial court had before it.

¶ 53    Turning to the merits, a criminal defendant must be afforded a meaningful opportunity to present a complete defense. *People v. Williams*, 2020 IL App (1st) 162512, ¶ 71 (citing *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)). In determining whether the right to present a defense was violated, a reviewing court considers whether crucial parts of the defendant's case were excluded so that the defendant was denied a sufficient opportunity to respond to the charges. *People v. Manion*, 67 Ill. 2d 564, 577 (1977).

¶ 54    A defendant also has the right to confront the witnesses against him or her, including cross-examination for the purpose of showing any interest, bias, prejudice, or motive to testify falsely. *People v. Klepper*, 234 Ill. 2d 337, 355 (2009). Limitation of cross-examination of a witness's bias, motive, or interest may violate the right to confront, and a trial court should be unwilling to grant a State's motion *in limine* if it will eviscerate the defendant's theory of the case. *People v.*

*Truly*, 318 Ill. App. 3d 217, 224 (2000). Conversely, it is axiomatic that the trial court may limit defense inquiries into the potential bias of a State witness, as the court has wide latitude to impose reasonable limits based on concerns about harassment, prejudice, confusion of the issues, witness safety, or repetitive questioning of little relevance. *Klepper*, 234 Ill. 2d at 355.

¶ 55    Evidence may be excluded if it is irrelevant (Ill. R. Evid. 402 (eff. Jan. 1, 2011)) or "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" (Ill. R. Evid. 403 (eff. Jan. 1, 2011)). In reviewing an evidentiary ruling for an abuse of discretion, "[w]hether we would have ruled the same way when faced with the same question is not the issue before us," but rather whether "no reasonable person would take the same view that the trial court did." *Williams*, 2020 IL App (1st) 162512, ¶ 75 (citing *People v. McDonald*, 2016 IL 118882, ¶ 32).

¶ 56    Even where evidence was admitted or excluded erroneously, we do not reverse where the error was harmless; that is, where there is no reasonable probability that the trier of fact would have acquitted the defendant absent the error. *People v. Heineman*, 2023 IL 127854, ¶ 95. A reviewing court is not required to isolate the particular limitation on cross-examination at issue to determine if it constitutes reversible error. *Klepper*, 234 Ill. 2d at 355-56. Instead, if the record as a whole shows that the trier of fact was made aware of adequate factors concerning relevant areas of witness impeachment, "no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *Id.* at 356.

¶ 57    Here, the parties disagree regarding the applicable standard of review. Mr. Garcia contends that our review should be *de novo* rather than the usual abuse of discretion standard applied to evidentiary rulings (*Heineman*, 2023 IL 127854, ¶ 59) because "whether a defendant's

constitutional right to present a defense was violated is a purely legal issue," citing *People v. Hale*, 2013 IL 113140, ¶ 15. The State responds that when, as here, a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, abuse of discretion is the standard of review.

¶ 58   We agree with the State that Mr. Garcia's claim that his cross-examination of Iwona was improperly limited is reviewed for an abuse of discretion. The *Hale* citation is merely to the broad proposition that, "[i]n general, the standard of review for determining if an individual's constitutional rights have been violated is *de novo*." *Hale*, 2013 IL 113140, ¶ 15. We have expressly rejected the proposition that, pursuant to *Hale*, we review *de novo* a claim that an improper evidentiary ruling denied a defendant's right to present a complete defense, and we held that such a claim is reviewed for an abuse of discretion. *Williams*, 2020 IL App (1st) 162512, ¶ 73. Abuse of discretion review is appropriate when the "defendant was allowed to, and did in fact present, his defense and his theory of the case." *Id.* ¶ 74. After reviewing the record, we find that the trial court did not abuse its discretion in granting the State's motion *in limine*.

¶ 59   The trial court may impose reasonable limits on evidence based on concerns about harassment, prejudice, confusion of the issues, witness safety, or repetitive questioning of little relevance. *Klepper*, 234 Ill. 2d at 355. Here, the defense was able to cross-examine Iwona about her efforts to get child support. Iwona denied that she ever threatened Mr. Garcia with allegations of abuse if he did not pay child support, but the defense elicited testimony from Mr. Garcia's sister, Imelda, that Iwona had threatened to report Mr. Garcia for abusing his children if he did not provide her with more child support. Mr. Garcia's theory of the case—that Iwona was the source of false accusations against him because she felt she did not receive sufficient child support from him—was not eviscerated. We find that Mr. Garcia "was allowed to, and did in fact present, his

defense and his theory of the case." *Williams*, 2020 IL App (1st) 162512, ¶ 74. Thus, the limitation imposed by the court was not unreasonable or an abuse of discretion.

¶ 60   To the extent that Mr. Garcia is arguing he should have been allowed to show that the allegations about the couple's own two children were false, we agree with the State that he has failed to support that argument with an offer of proof, which would be necessary to support such a claim. As our supreme court has admonished: "An adequate offer of proof is the key to preserving a trial court's error in excluding evidence." *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998). Moreover, the trial court was certainly within bounds to not allow either side to try to prove or disprove allegations regarding other minors as part of the case regarding J.K.

¶ 61   We also find that any error in the exclusion of the evidence at issue would have been harmless. Iwona was neither the alleged victim nor the key witness here; J.K. was. J.K. testified to Mr. Garcia's sexual assaults, and Iwona's credibility was relevant only insofar as it affected J.K.'s credibility. J.K. testified when she was an adult and expressly denied that Iwona told her what to say. Under such circumstances, we find no reasonable probability that the trier of fact would have acquitted Mr. Garcia had the evidence at issue been admitted. This renders any error in limiting this evidence harmless. *Heineman*, 2023 IL 127854, ¶ 95.

¶ 62                          IV. CONCLUSION

¶ 63   Accordingly, the judgment of the trial court is affirmed.

¶ 64   Affirmed.